# Exhibit A

| SUMMONS | CIVIL DOCKET NO.<br>2585CV0892D | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| Case Name: | Dennis P. McManus | Clerk of Courts |
|---|---|---|
| *Power Play Hockey, LLC*  Plaintiff(s)<br>vs.<br>*Nolan Gauthier and*<br>*Non-Compete Hockey League*  Defendant(s) | **Worcester** | County |

COURT NAME & ADDRESS:
Worcester Superior Court
225 Main Street
Worcester, MA 01608

THIS SUMMONS IS DIRECTED TO _Nolan Gauthier_ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the _7x7.25_ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

A TRUE COPY ATTEST

DEPUTY SHERIFF

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business, Worcester County Superior Court _225 Main St. Worcester, MA 01608_ (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the complaint was e-filed through that portal, **AND**

    b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: _Joseph Prive, 111 Amherst St. Manchester, NH 03101_

**3. What to include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont).** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti, Chief Justice on _____, 20_____. (Seal)

Clerk _____

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

PROOF OF SERVICE OF PROCESS

---

I hereby certify that on _____, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in the Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

**N.B. TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

**E-Filed**

| CIVIL ACTION COVER SHEET | DOCKET NUMBER  25cv892D | Massachusetts Trial Court  Superior Court |
|---|---|---|
| | | COUNTY Worcester Superior Court (Worcester) |

| Plaintiff | Power Play Hockey, LLC | Defendant: | Nolan Gauthier |
|---|---|---|---|
| ADDRESS: | 60 Lowell Road | ADDRESS: | 625 Plantation Street |
| Salem, New Hampshire 03079 | | Worcester, Massachusetts 01605 | |

| Plaintiff Attorney: | Jeffrey Adams | Defendant: | Non-Compete Hockey League |
|---|---|---|---|
| ADDRESS: | 111 Amherst Street | ADDRESS: | 625 Plantation Street |
| Manchester, New Hampshire 03101 | | Worcester, Massachusetts 01605 | |
| BBO: | 662697 | | |

| Plaintiff Attorney: | Joseph Prive | Defendant Attorney: | |
|---|---|---|---|
| ADDRESS: | 111 Amherst Street | ADDRESS: | |
| Manchester, New Hampshire 03101 | | | |
| BBO: | 710191 | BBO: | |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)**

| CODE NO.  AO4 | TYPE OF ACTION (specify)  Employment Contract | TRACK  F | HAS A JURY CLAIM BEEN MADE?  ☒ YES    ☐ NO |
|---|---|---|---|

*If "Other" please describe:

| Is there a claim under G.L. c. 93A?  ☒ YES    ☐ NO | Is there a class action under Mass. R. Civ. P. 23?  ☐ YES    ☒ NO |
|---|---|

**STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

**TORT CLAIMS**

A. Documented medical expenses to date
   1. Total hospital expenses
   2. Total doctor expenses
   3. Total chiropractic expenses
   4. Total physical therapy expenses
   5. Total other expenses (describe below)

                              Subtotal (1-5):    $0.00

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below)

Disgorgement

                              TOTAL (A-F):    $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

Plaintiffs' sources of revenue were converted by defendant by and through a willful misappropriation of confidential information and trade secrets.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Breach of Non-Disclosure Agreement and Restrictive Covenants Agreement (permanent injunction) | $0.00 |
| 2. | Breach of Non-Disclosure Agreement and Restrictive Covenants Agreement (damages) | $100,000.00 |
| 3. | Related claims for statutory damages and fees pursuant to G.L. 93A, ss. 2, 11, and NH RSA 350-B | to be determined |
| | (to be determined)                                                    Total | $100,000.00 |

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

| Signature of Attorney/Self-Represented Plaintiff: X _____ | Date: 7 / 3 / 2025 |
|---|---|

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION UNDER S.J.C. RULE 1:18(5)

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18; Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney: X _____ | Date: 7 / 3 / 2025 |
|---|---|

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

# CIVIL ACTION COVER SHEET INSTRUCTIONS —
## SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

### AC Actions Involving the State/Municipality †*

AA1 Contract Action Involving Commonwealth,
  Municipality, MBTA, etc.                    (A)
AB1 Tortious Action Involving Commonwealth,
  Municipality, MBTA, etc.                    (A)
AC1 Real Property Action Involving
  Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action Involving Commonwealth,
  Municipality, MBTA, etc.                    (A)
AE1 Administrative Action Involving
  Commonwealth, Municipality, MBTA, etc.  (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials            (A)
A02 Goods Sold and Delivered                  (F)
A03 Commercial Paper                          (F)
A04 Employment Contract                       (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1  (F)
A06 Insurance Contract                        (F)
A08 Sale or Lease of Real Estate              (F)
A12 Construction Dispute                      (A)
A14 Interpleader                              (F)
BA1 Governance, Conduct, Internal
  Affairs of Entities                         (A)
BA3 Liability of Shareholders, Directors,
  Officers, Partners, etc.                    (A)
BB1 Shareholder Derivative                    (A)
BB2 Securities Transactions                   (A)
BC1 Mergers, Consolidations, Sales of
  Assets, Issuance of Debt, Equity, etc.  (A)
BD1 Intellectual Property                     (A)
BD2 Proprietary Information or Trade
  Secrets                                     (A)
BG1 Financial Institutions/Funds              (A)
BH1 Violation of Antitrust or Trade
  Regulation Laws                             (A)
A99 Other Contract/Business Action - Specify (F)

\* See Superior Court Standing Order 1-88 for an
explanation of the tracking deadlines for each track
designation: F, A, and X. On this page, the track
designation for each case type is noted in
parentheses.

†\* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

‡ Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract        (A)
D02 Reach and Apply                           (F)
D03 Injunction                                (F)
D04 Reform/ Cancel Instrument                 (F)
D05 Equitable Replevin                        (F)
D06 Contribution or Indemnification           (F)
D07 Imposition of a Trust                     (A)
D08 Minority Shareholder's Suit               (A)
D09 Interference in Contractual Relationship  (F)
D10 Accounting                                (A)
D11 Enforcement of Restrictive Covenant       (F)
D12 Dissolution of a Partnership              (F)
D13 Declaratory Judgment, G.L. c. 231A        (A)
D14 Dissolution of a Corporation              (F)
D99 Other Equity Action                       (F)

### PA Civil Actions Involving Incarcerated Party ‡

PA1 Contract Action Involving an
  Incarcerated Party                          (A)
PB1 Tortious Action Involving an
  Incarcerated Party                          (A)
FC1 Real Property Action Involving an
  Incarcerated Party                          (F)
PD1 Equity Action Involving an
  Incarcerated Party                          (F)
PE1 Administrative Action Involving an
  Incarcerated Party                          (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal
  Injury/Property Damage                      (F)
B04 Other Negligence - Personal
  Injury/Property Damage                      (F)
B05 Products Liability                        (A)
B06 Malpractice - Medical                     (A)
B07 Malpractice - Other                       (A)
B08 Wrongful Death - Non-medical              (A)
B15 Defamation                                (A)
B19 Asbestos                                  (A)
B20 Personal Injury - Slip & Fall             (F)
B21 Environmental                             (F)
B22 Employment Discrimination                 (F)
BE1 Fraud, Business Torts, etc.               (A)
B99 Other Tortious Action                     (F)

### RP Summary Process (Real Property)

S01 Summary Process - Residential             (X)
S02 Summary Process - Commercial/
  Non-residential                             (F)

### RP Real Property

C01 Land Taking                               (F)
C02 Zoning Appeal, G.L. c. 40A                (F)
C03 Dispute Concerning Title                  (F)
C04 Foreclosure of a Mortgage                 (X)
C05 Condominium Lien & Charges                (X)
C99 Other Real Property Action                (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding              (X)
E97 Prisoner Habeas Corpus                    (X)
E22 Lottery Assignment, G.L. c. 10, § 28      (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A   (X)
E21 Protection from Harassment, G.L. c. 258E  (X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency,
  G.L. c. 30A                                 (X)
E03 Certiorari Action, G.L. c. 249, § 4       (X)
E05 Confirmation of Arbitration Awards        (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9       (X)
E07 Mass Antitrust Act, G.L. c. 93, § 8       (X)
E08 Appointment of a Receiver                 (X)
E09 Construction Surety Bond, G.L. c. 149,
  §§ 29, 29A                                  (A)
E10 Summary Process Appeal                    (X)
E11 Worker's Compensation                     (X)
E16 Auto Surcharge Appeal                     (X)
E17 Civil Rights Act, G.L. c.12, § 11H        (X)
E24 Appeal from District Court
  Commitment, G.L. c.123, § 9(b)              (X)
E94 Forfeiture, G.L. c. 265, § 56             (X)
E95 Forfeiture, G.L. c. 94C, § 47             (F)
E99 Other Administrative Action               (X)
Z01 Medical Malpractice - Tribunal only,
  G.L. c. 231, § 60B                          (F)
Z02 Appeal Bond Denial                        (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A, § 12        (X)
E14 SDP Petition, G.L. c. 123A, § 9(b)        (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c. 6, § 178M  (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S  (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | _F_ | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND
## ACCURATELY, THE CASE MAY BE DISMISSED.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

$275

## E-Filed

### COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                                    SUPERIOR COURT DEPARTMENT

---

POWER PLAY HOCKEY, LLC,      )
                             )
Plaintiff                    )
                             )
v.                           )          Civil Action No. 25CV 892 D
                             )
NOLAN GAUTHIER and NON-      )
COMPETE HOCKEY LEAGUE,       )
                             )
Defendants.                  )
                             )

---

### <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

Plaintiff Power Play Hockey, LLC ("Plaintiff" or "Power Play"), by and through its attorneys Devine Millimet & Branch, Professional Association, brings this action against Defendants Nolan Gauthier ("Gauthier") and the Non-Compete Hockey League ("NCHL") (collectively, the "Defendants") seeking injunctive relief and monetary damages for breach of contract, unjust enrichment, and violations of Mass. Gen. Laws. Ch. 93A, §§2, 11 and N.H. R.S.A. §350:B-1.[1] Pursuant to Section 33 of the subject Non-Disclosure Agreement, Power Play requests reasonable attorney's fees and costs. Attached hereto are the governing Non-Disclosure Agreement (<u>Exhibit A</u>) and Restrictive Covenants Agreement (<u>Exhibit B</u>). Power Play's Motion for Temporary Restraining Order and Preliminary Injunction and supporting papers are concurrently filed herewith. Power Play alleges as follows:

---

[1] The subject agreements between the parties, which include the Non-Disclosure Agreement, are governed by New Hampshire law. Gauthier's unfair and deceptive acts occurred primarily and substantially in Massachusetts.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

## INTRODUCTION

1.      This case concerns agreements between Power Play, a well-known hockey league

and sports-leisure services provider, Gauthier, a former Power Play Division Head, and the

competing hockey league – NCHL – that Gauthier created. Power Play and Gauthier agreed to

operate and organize an amateur hockey league in New England, with Gauthier's involvement

being specific to Power Play operations in Massachusetts. After agreeing to perform the services

of Power Play league Division Head in exchange for valuable consideration, Gauthier started a

rival hockey league in Massachusetts in willful violation of the obligations to which he had just

agreed—to wit, to not misappropriate the know-how, customer and client lists, and other

contractually defined confidential information owned by Power Play in order to compete against

Power Play. Gauthier nonetheless misappropriated the confidential information and trade secrets

of Power Play, thereby converting Power Play customers and clients to join Gauthier's rival

competing hockey league, which he named in mocking reference the "Non-Compete Hockey

League." Gauthier's knowing and willful actions have directly caused damages to Power Play

exceeding $100,000 to date.

## PARTIES

2.      Plaintiff Power Play Hockey, LLC is a New Hampshire limited liability company

having a usual place of business at 60 Lowell Road, Salem, New Hampshire.

3.      Defendant Nolan Gauthier is an individual residing at, upon information and belief,

625 Plantation Street, Worcester, Massachusetts.

4.      Defendant Non-Compete Hockey League is an unincorporated association having

a business address at, upon information and belief, 625 Plantation Street, Worcester,

Massachusetts.

2

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

## JURISDICTION AND VENUE

5.    The Court has equity jurisdiction pursuant to G.L. c. 214, §1.

6.    The Court has subject matter jurisdiction pursuant to G.L. c. 212, §3, and the amount in controversy exceeds $50,000.

7.    The Court has personal jurisdiction over Gauthier pursuant to G.L. c. 223A, §2 because he is domiciled in Massachusetts.

8.    The Court has personal jurisdiction over the Non-Compete Hockey League pursuant to G.L. c. 223A, §2 because it has a usual place of business in Massachusetts.

9.    Venue is proper in Worcester County, pursuant to G.L. c. 223, §1, because Defendants are domiciled therein.

## STATEMENT OF FACTS

10.    Power Play operates "Power Play Hockey League," the fastest growing, veteran-owned adult hockey league in New Hampshire and Massachusetts.

11.    Power Play has run hockey leagues in Massachusetts for nearly eight years, where it operates in 40 facilities, including in Worcester.

12.    From around 2019 to 2024, Gauthier was a player and league administrator for Power Play.

13.    On or around January 9, 2024, Power Play and Gauthier agreed that Gauthier would perform the services of a Division Head in exchange for valuable consideration and subject to, among other things, the terms and conditions contained in two valid and binding agreements into which he entered: (1) the Non-Disclosure Agreement ("NDA"); and (2) a Restrictive Covenants Agreements ("RCA") (collectively, the "Agreements"). *See* Exhibits A-B.

3

14.     The terms of Gauthier's compensation were clearly communicated to Gauthier before he signed the Agreements and are set forth in the "Division Head – Job Description & SOP" (the "Job Description"), a copy of which is attached hereto as <u>Exhibit C</u>. The terms include:

> Part-Time, Compensation Plan: Compensation is given in the sum of or up to one season player fee. This compensation will also be extended to tournament play for up to the cost of each tournament a PPHL employee attends.
>
> For example: Season Fee: $485 (3 Seasons per year)
>
> Tournament Fee: Battle of the Branches: $250; Puzzle Cup: $125; Other Tournaments may vary in costs.
>
> Yearly Division Head Base Compensation: $1,455
>
> 2x Tournaments Attended Compensation: $375
>
> **Total Compensation: $1,830** (emphasis in original).

15.     The Job Description further defines the responsibilities and obligations of a Division Head and specifically states the following:

> …Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be enforced by law. A separate document signed by each division head (restricted covenants agreement, non-solicitation, non-disclosure, and non-compete period of 24 months from the end of employment shall apply. Violations will result in legal action and financial penalties to recover damages per the signed contract…

**A. <u>Non-Disclosure Agreement ("NDA")</u>**

16.     Under the NDA, consistent with the Job Description, Gauthier was to serve in the position of Division Head. As such, Gauthier was the primary point of contact and representative (*i.e.*, "boots on the ground") for Power Play league administration and for individual team leadership and players. Gauthier was to supervise officials and scorekeepers, oversee team registration and organization, and monitor player fee collection, among other things.

17.     In exchange for the above services provided by Gauthier as Division Head, Gauthier agreed to be bound by the terms of the NDA, which survive the termination of Gauthier's

4

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

engagement with Power Play and prohibits him from engaging in certain conduct both during and after the termination of his contract with Power Play with respect to Power Play's confidential information and with respect to competition adverse to Power Play.

18.     Specifically, the NDA restrains Gauthier, for a period of two (2) years from the termination of the NDA, from disclosing confidential information and obligates him to undertake good faith efforts to prevent disclosure of same. The NDA terminates automatically on the date Gauthier's retention by Power Play ceases.

19.     Section 3 of the NDA defines "Confidential Information" as all data and information relating to the business and management of Power Play, including, but not limited to: Customer Information, Intellectual Property, Marketing and Development Information, Business Operations, Product Information, Production Processes, Service Information, Proprietary Computer Code, Computer Technology, and Accounting Information.

20.     Under the NDA, Gauthier specifically agreed to the following:

> a.  the Confidential Information was and would remain the exclusive property of Power Play and would be used by Gauthier only for the specifically defined "Permitted Purpose" (Section 6) under the NDA. Gauthier agreed that he would not use the Confidential Information for any purpose that might be directly or indirectly detrimental to Power Play (Section 6).

> b.  any current or anticipated business opportunities similar to that of Power Play that came or would come to Gauthier's attention was and is an opportunity belonging to Power Play, and that Gauthier would (1) advise Power Play of such opportunity(ies) and (2) not pursue the opportunity, directly or indirectly, without Power Plays' written consent (Section 9).

> c.  not to solely or jointly join any planning for or organization of a business activity in competition with Power Play, including those which Power Play determines to be in conflict with its best interests (Section 10).

> d.  for five (5) years after the termination or expiration of the NDA, not be directly or indirectly involved with a business which is in direct competition with Power Play, and that during the same five (5) year period, to not divert or attempt to divert from Power Play any business that Power Play has

5

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

enjoyed, solicited, or attempted to solicit, from Power Play's customers (Sections 12-13).

21.     Section 18 of the NDA sets forth Power Play's remedies in the event of Gauthier's default on his obligations.

> The Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause irreparable injury to [Power Play]. Accordingly, [Gauthier agrees] that [Power Play] is entitled to, in addition to all other rights and remedies available to it at law or in equity, an injunction restraining [Gauthier] and any agents of [him], from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

22.     Section 33 of the NDA states that Gauthier is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by Power Play in enforcing this Agreement as a result of any default of this Agreement by Gauthier.

23.     On January 9, 2024, Gauthier electronically signed, by Docusign with reliable supporting documentation therefore, the NDA and agreed to the above terms.

**B.  Restrictive Covenant Agreement ("RCA")**

24.     Section 1 of the RCA defines, in all material ways consistent with the NDA, that "Confidential Information" means:

> [Power Play] information furnished to [Gauthier] or to which access is provided to [him] by [Power Play] orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential". Confidential Information also includes all customer and business information and all other information of any kind and nature in [Power Play] databases and systems to which [Gauthier is] provided access.

25.     Under Section 1 of the RCA, Gauthier acknowledged that such Confidential Information is a valuable and unique asset of Power Play's business and agreed to treat as secret and confidential all such information whether or not identified by Power Play as such.

6

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

26.     Under Section 2 the RCA, Gauthier acknowledged that the relationships of Power Play with its employees, customers and vendors are valuable business assets and the identify of, and relationships with, such parties are proprietary and constitute Confidential Information. Thereunder, Gauthier agreed that he would not directly or indirectly (for himself or for any third party) divert, circumvent, or attempt to divert or circumvent, from Power Play any business, employee, customer, or vendor, through solicitation or otherwise.

27.     The RCA further provides that in the event of Gauthier's default on any obligation under the RCA, Power Play would be entitled to injunctive relief and that such remedy shall not be deemed to be an exclusive remedy but shall be in addition to all other remedies available to Power Play for all damages, costs and expenses incurred by Power Play.

28.     The RCA was to terminate "by mutual agreement or by either party for any reason upon ten (10) days' notice to the other." Upon termination, Gauthier was to return, among other things, Power Play's confidential information.

29.     On January 9, 2024, Gauthier signed the RCA concurrently with his signature of the NDA, by the same electronic means and with the same reliable verification of signature.

**C. Gauthier's Willful Breach of NDA and RCA and Related Actionable Conduct**

30.     Despite the express and unambiguous terms contained in the Agreements, Gauthier willfully breached the Agreements when, on or around May 7, 2025, he started the NCHL that directly competes with Power Play.

31.     In creating NCHL, he misappropriated Confidential Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams, customer names, customer contact information from Power Play to participate in NCHL.

7

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

32.     Specifically, to date, Gauthier, by and through NCHL, stole not less than six hockey teams from Power Play to the NCHL, thereby wrongfully depriving Power Play of not less than $100,000 in revenue.

33.     Gauthier, by and through NCHL, committed and is committing the above actions substantially with the use of Power Play's Confidential Information.

34.     Gauthier has used the contact information of players and team captains to wrongfully solicit players, captains, and teams from Power Play to NCHL.

35.     But for Gauthier's wrongful use of Power Play's Confidential Information in this manner, such players, captains, and teams would still be engaged with Power Play.

36.     That Gauthier's breach and related conduct was knowing, willful, and malicious is underscored by the league name, "Non-Compete Hockey League," which intentionally invokes the very obligations under the Agreements that he flagrantly disregarded and continues to disregard.

37.     Through email communication to Power Play dated November 14, 2024, Gauthier informed Power Play that he was "starting my own league in Worcester without PPHL," that he would "take as many teams with [Gauthier] as possible," and that he had "already started the process."

38.     In order to play hockey with Power Play, a team pays in total approximately $15,000 per year. This figure comprises an average fee of $1,500 per player per year to cover reasonable and necessary provisions, venues, and administration of hockey games and league play at an above average industry standard by Power Play. Power Play provides a competitive environment with live stats, referees, scorekeepers, department of player safety, back-end team management, etc.

8

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

39.     Insofar as Gauthier, by and through NCHL, has converted not less than six (6) teams from Power Play, the actual loss—that is, direct damages, not accounting for consequential or benefit of the bargain damages—in the form of revenue of which Power Play has been wrongfully deprived by Defendants is not less than $100,000.

**COUNT I – BREACH OF THE AGREEMENTS**
***Permanent Injunctive Relief* (Section 18 of NDA and RCA)**

40.     Power Play incorporates by reference Paragraphs 1 through 39, as if stated hereunder.

41.     On or about January 9, 2024, Power Play and Gauthier entered into valid, enforceable, and binding contracts when they executed the Agreements.

42.     Under the Agreements, Power Play permitted Gauthier to play hockey in the Power Play Hockey League without cost, as substantial consideration for certain services to be provided by Gauthier, as defined above.

43.     As consideration for serving as a Division Head, Gauthier received from Power Play $1,830 in compensation. *See* Exhibit C.

44.     In exchange for the consideration given by Power Play, Gauthier agreed to, among other things, perform the duties of a Power Play league Division Head, and in so doing to comply at all relevant times with the terms of the Agreements.

45.     Specifically, under the Agreements, Gauthier was and is contractually obligated to:

    a.    Not misappropriate Confidential Information that solely belongs to Power Play;

    b.    Not misappropriate business opportunities arising out of Gauthier's duties to Power Play, which opportunities solely belong to Power Play; and

    c.    Not compete with Power Play, whether directly or indirectly, within the field of adult hockey in New England.

46.     Power Play performed or was ready, willing, and able to perform but was excused from performing its obligations under the Agreements. Specifically, Power Play at all relevant

9

times permitted Gauthier to play hockey with Power Play without cost and otherwise provided professional support and direction to Gauthier as a Power Play Division Head.

47.    Gauthier willfully breached the foregoing obligations when, on or around May 7, 2025, he started the NCHL that directly competes with Power Play. In so acting, Gauthier misappropriated Confidential Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams and player names and contact information from Power Play to participate in NCHL.

48.    While substantially relying on Power Play Confidential Information, Gauthier, by and through NCHL, converted not less than six (6) teams from Power Play, thereby wrongfully depriving Power Play of not less than $100,000 in revenue.

49.    Pursuant to Section 18 of the NDA and Page 3 of the RCA, respectively, given the proprietary and confidential nature of the information misappropriated by Gauthier, his willful misappropriation, disclosure, and exploitation of same cannot be reasonably or adequately compensated for in money damages and has caused and continues to cause Power Play irreparable injury.

50.    Under Section 18 of the NDA and Page 3 of the RCA, respectively, Gauthier specifically agreed that Power Play is entitled to, among all other remedies, an injunction restraining Gauthier and any of his agents from directly or indirectly committing or engaging in the restricted acts Gauthier has engaged and continues to engage in with respect to Power Play's Confidential Information.

51.    Power Play is therefore entitled to an order permanently enjoining Gauthier and, through Gauthier and NCHL from engaging in any act that is in violation of the Agreements with

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

respect to Power Play's Confidential Information, to include the operation of a hockey league or any other related venture that competes with, directly or indirectly, Power Play or its business.

## COUNT II – BREACH OF CONTRACT

52.    Power Play incorporates by reference paragraphs 1 through 51, as if stated hereunder.

53.    On or about January 9, 2024, Power Play and Gauthier entered into valid, enforceable, and binding contracts when they entered into the Agreements.

54.    Under the Agreements, Power Play permitted Gauthier to play hockey in a Power Play Hockey League without cost, as substantial consideration for certain services to be provided by Gauthier, as defined above.

55.    As consideration for serving as a Division Head, Gauthier received from Power Play $1,830 in compensation.

56.    In exchange for the consideration given by Power Play, Gauthier agreed to, among other things, perform the duties of a Power Play league Division Head, and in so doing to comply at all relevant times with the terms of the Agreements.

57.    Gauthier willfully breached his foregoing obligations under the Agreements when, on or around May 7, 2025, he started the NCHL that directly competes with Power Play. In creating NCHL, he misappropriated Confidential Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams from Power Play to participate in NCHL.

58.    The damages sustained by Power Play that directly, foreseeably, and intentionally flow from Gauthier's breach include, but is not necessarily limited to:

   a. Lost revenue amounting to over $100,000 directly resulting from Gauthier's misappropriation of teams and related Confidential Information to which Gauthier obtained access only through his engagement with Power Play;

11

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

    b.  Reputational harm caused by Gauthier's defamations intended to undermine Power Play's business and to misappropriate teams and players from Power Play; and

    c.  Attorney's fees and costs pursuant to Section 33 of the Non-Disclosure Agreement incurred by Power Play to enforce its rights under the Agreements.

59.    The damages as set out above flow directly from and are the natural and probable consequences of Gauthier breach of the Agreements.

## COUNT III – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

60.    Power Play incorporates by reference paragraphs 1 through 59, as if stated hereunder.

61.    On or about January 9, 2024, Power Play and Gauthier entered into valid, enforceable, and binding contracts when they executed the Agreements.

62.    Power Play permitted Gauthier to play hockey in a Power Play Hockey League without cost, as substantial consideration for certain services to be provided by Gauthier, as defined above.

63.    As consideration for serving as a Division Head, Gauthier received from Power Play $1,830 in compensation.

64.    In exchange for the consideration given by Power Play, Gauthier agreed to, among other things, perform the duties of a Power Play league Division Head, and in so doing to comply at all relevant times with the terms of the Agreements.

65.    Specifically, under the Agreements, Gauthier was and is contractually obligated to:

    a.  Not misappropriate Confidential Information that solely belongs to Power Play;

    b.  Not misappropriate business opportunities arising out of Gauthier's duties to Power Play, which opportunities solely belong to Power Play; and

    c.  Not compete with Power Play, whether directly or indirectly, within the field of adult hockey in New England.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

66.     On or about May 7, 2025, Gauthier breached his implied covenant of good faith and fair dealing by exercising the discretion afforded to him the NDA and the Division Head agreement as pretext for his own gain. Specifically, Gauthier was permitted subject to certain express covenants to access confidential information pursuant to his obligations under the contract. Gauthier knew and knows that Power Play only granted such access and such other consideration to Gauthier as Division Head on condition that he observe and honor the express and implied obligations and covenants. With knowledge and willfulness, he did not honor the obligations and covenants.

67.     Gauthier breached them when, on or around May 7, 2025, he started NCHL that directly competes with Power Play. In so acting, Gauthier misappropriated Confidential Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams from Power Play to participate in NCHL.

68.     While substantially relying on Power Play Confidential Information, Gauthier, by and through NCHL, converted not less than six (6) teams from Power Play, thereby wrongfully depriving Power Play of not less than $100,000 in revenue.

69.     Pursuant to Section 18 of the NDA and Page 3 of the RCA, respectively, given the proprietary and confidential nature of the information misappropriated by Gauthier, his willful misappropriation, disclosure, and exploitation of same cannot be reasonably or adequately compensated for in money damages and has caused and continues to cause Power Play irreparable injury.

## COUNT IV – UNJUST ENRICHMENT

70.     Power Play incorporates by reference Paragraphs 1 through 69, as if set forth hereunder.

13

71.     Power Play alleges in the alternative to their breach of contract claims that Power Play is entitled to recover under the doctrine of unjust enrichment if it is determined that the Agreements do not cover the subject matter of this dispute between Power Play and Gauthier.

72.     Power Play gave Gauthier a non-gratuitous benefit in the form of the ability to play in Power Play hockey leagues without cost and otherwise provided professional support and direction to Gauthier as a Power Play Division Head and in the form of access to commercially valuable, proprietary, and confidential information.

73.     Gauthier was enriched by virtue of his unauthorized and willful misappropriation and exploitation of Power Play's commercially valuable, proprietary, and confidential information, through which improper use Gauthier was enriched in the form of paying hockey teams he converted from Power Play's leagues to NCHL.

74.     Power Play reasonably expected consideration from Gauthier for the benefit Gauthier derived from such use.

75.     Gauthier was aware and had actual or chargeable knowledge that Power Play expected compensation from Gauthier for such use and that the use was not gratuitously provided.

76.     Gauthier accepted and unjustly retained the benefits of such use and the profits and all other value derived therefrom.

77.     The reasonable value of the commercial use of the confidential information is not less than $100,000.

78.     For all the reasons stated above, it is against equity and good conscience to permit Gauthier to retain the value of the Confidential Information of Power Play without compensation.

14

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

## COUNT V – N.H. UNIFORM TRADE SECRET ACT (N.H. R.S.A. 350-B)

79.     Power Play incorporates by reference paragraphs 1 through 78, as if set forth hereunder.

80.     Gauthier is in breach of his contractual obligations under the above-defined Agreements with respect to Power Play's Confidential Information.

81.     Power Play's Confidential Information, as defined above and in the Agreements, constitutes trade secrets under New Hampshire's Uniform Trade Secret Act, specifically N.H. R.S.A. 350B-1(IV).

82.     Because the Agreements are governed by New Hampshire law, N.H. R.S.A. 350-B:1, *et seq.* governs Gauthier's contract-based misappropriation of trade secrets.

83.     Power Play's trade secrets include in large part its business operations processes concerning the administration of adult hockey leagues throughout New England. Power Play's trade secret also includes the contact information, customer habits, and related sensitive and protected information.

84.     Power Play derives independent economic value from the fact that the Confidential Information is not generally known to other persons who can obtain economic value from its disclosure or use and is the subject of specific efforts to maintain its secrecy.

85.     Power Play's reasonable measures to ensure the secrecy of the Confidential Information are manifest throughout the Agreements.

86.     Power Play's measures in this regard were and are so well-known to those whom it engages as Division Heads or vendors that Gauthier, in the course of his willful breach and misappropriation, named his improper league by specific reference to said obligations.

15

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

87.    But for Gauthier's access to Power Play's trade secrets, Gauthier would not have been able to derive the substantial economic and professional benefit he so derives by, among other things, misappropriating teams, players, and revenues from Power Play.

88.    Power Play never consented to Gauthier's disclosure of Power Play's trade secrets, which disclosure occurred and occurs in the regular course of Gauthier's operation of NCHL.

89.    Gauthier acquired Power Play's trade secrets through improper means, to wit, misrepresentation of his intent to comply with his contractual obligations and by willful, knowing, and malicious breach of same.

90.    Based on the foregoing, pursuant to N.H. R.S.A. 350-B:2, Power Play is entitled to an order enjoining Gauthier from using or in any way benefiting from Power Play's trade secrets, to include from direct or indirect involvement with a league or related venture that directly competes with Power Play's hockey leagues or related venture.

91.    Based on the foregoing, pursuant to N.H. R.S.A. 350-B:3 and B:4, Power Play is entitled to actual loss damages, as stated above; statutory exemplary damages, because Gauthier's misappropriation was knowing and willful; and attorney's fees, because Gauthier's misappropriation was done in bad faith, knowing, and willful.

## COUNT VI– G.L. c. 93A, § 11

92.    Gauthier incorporates by reference paragraphs 1 through 90, as if set forth hereunder.

93.    Power Play, Gauthier, and NCHL are persons within the meaning of G.L. c. 93A, §§ 1(a) and 11.

94.    At the time of Gauthier's and NCHL's unfair acts and unfair methods of competition, Power Play had and has as its business the provision of services in the form of administration of adult hockey leagues throughout New England, including Massachusetts.

95.    Power Play, Gauthier, and NCHL were and are engaged in trade or commerce with each other within the meaning of G.L. c. 93A at the time of Gauthier's and NCHL's unfair acts and unfair methods of competition. Specifically, Gauthier's and NCHL's unfair acts and deceptive methods of competition began and followed from their use of misappropriated Confidential Information to specifically undermine Power Play's business and to usurp customers and clients from Power Play within Massachusetts.

96.    Gauthier's and NCHL's unfair acts and deceptive methods of competition constitute willful and knowing violations of Chapter 93A for the reasons as set forth above, including specifically Gauthier's knowing operations in violation of his non-disclosure and non-competition obligations as embodied by Gauthier calling its improper league the "Non-Compete" league.

97.    These unfair acts and deceptive methods of competition substantially took and continue to take place in Massachusetts and Gauthier's threats to so act intentionally exclusively concern actions undertaken in Massachusetts, pursuant to Gauthier's November 14, 2024 email communication to Power Play in which Gauthier informed Power Play that he was "starting my own league in Worcester without PPHL," that he would "take as many teams with [Gauthier] as possible," and that he had "already started the process."

98.    As a direct and proximate result of Gauthier's and NCHL's 93A §11 violations, Power Play has suffered damages and continues to so suffer in an amount to be determined at trial.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Power Play Hockey, LLC respectfully requests that this Honorable Court enter judgment on all counts against Defendants as follows:

A. Enter an temporary restraining order that immediately restrains Defendants from any act prohibited by the Non-Disclosure Agreement and Restrictive Covenant Agreement, including the operation of a hockey league(s) that competes with, directly or indirectly, any hockey league or related business venture of Plaintiff;

B. Enter an order of permanent injunction restraining Defendants from any act prohibited by the Non-Disclosure Agreement and Restrictive Covenant Agreement, including the operation of a hockey league(s) that competes with, directly or indirectly, any hockey league or related business venture of Plaintiff;

C. Enter an order enjoining the NCHL from further operation;

D. Award damages, including in an amount to be determined at trial;

E. Award exemplary damages, pursuant to G.L. c. 93A, §§2, 11 and N.H. R.S.A. 350-B:3;

F. Award reasonable attorney's fees and costs pursuant to Section 33 of the Non-Disclosure Agreement and pursuant to G.L. c. 93A, §§2, 11 and N.H. R.S.A. 350-B:4

G. Award pre and post-judgment interest; and

H. Award all such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Power Play Hockey, LLC hereby demands a trial by jury on all claims and issues so triable.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

## VERIFICATION

I, Johnny Kula, , under the pains and penalties of perjury, hereby depose and say that I

am the Chief Financial Officer and Co-Owner of Plaintiff Power Play Hockey, LLC in the above-

captioned action and that I have read the allegations in the foregoing Verified Complaint and, as

to each statement of fact alleged therein, I hereby affirm and verify that I have actual knowledge

of each such fact and that such fact is true, except as to matters specifically alleged on

information and belief, which I believe to be true.

Signed under the pains and penalties of perjury on this ___ day of July 2025,

Johnny Kula
Chief Financial Officer and Co-Owner
Power Play Hockey, LLC

19

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

Respectfully submitted,
Plaintiff
**POWER PLAY HOCKEY, LLC**
By its attorney,

Dated: July 3, 2025

*/s/ Jeffrey D. Adams*
Jeffrey D. Adams (BBO No. 662697)
Joseph Prive (BBO No. 710191)
**DEVINE MILLIMET & BRANCH, P.A.**
111 Amherst Street
Manchester, New Hampshire
(603) 669-1000
jadams@devinemillimet.com
jprive@devinemillimet.com

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

# EXHIBIT A

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

# NON-DISCLOSURE AGREEMENT

**THIS NON-DISCLOSURE AGREEMENT** (the "Agreement")

dated this day of January 9, 2024.

(the "Execution Date"),

**BETWEEN:**

Power Play Hockey, LLC of 60 Lowell Rd., Salem, NH 03079

(the "Client")

**- AND -**

Nolan Gauthier of 318, West Boylston, MA 01583

(the "Contractor")

## BACKGROUND:

1.  The Contractor is currently or may be retained as an independent contractor with the Client for the position of: Division Head. In addition to this responsibility or position (the "Contractor"), this Agreement also covers any position or responsibility now or later held with the Client.

2.  The Contractor will receive from the Client, or develop on behalf of the Client, Confidential Information as a result of the Retainer (the 'Permitted Purpose').

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

IN CONSIDERATION OF and as a condition of the Client retaining the Contractor and the Client providing the Confidential Information to the Contractor in addition to other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

## CONFIDENTIAL INFORMATION

1.  All written and oral information and materials disclosed or provided by the Client to the Contractor under this Agreement is Confidential Information regardless of whether it was provided before or after the date of this Agreement or how it was provided to the Contractor.

2.  The Contractor acknowledges that in any position the Contractor may hold, in and as a result of the Contractor's retainer by the Client, the Contractor will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Client and which information is the exclusive property of the Client.

3.  'Confidential Information' means all data and information relating to the business and management of the Client, including but not limited to, the following:

    a.  'Customer Information' which includes names of customers of the Client, their representatives, all customer contact information, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by customers of the Client;

    b.  'Intellectual Property' which includes information relating to the Client's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, technical concepts, test data and test results, simulation results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

c.    'Marketing and Development Information' which includes marketing and development plans of the Client, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Client which have been or are being discussed;

d.    'Business Operations' which includes internal personnel and financial information of the Client, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Client's business;

e.    'Product Information' which includes all specifications for products of the Client as well as work product resulting from or related to work or projects performed or to be performed for the Client or for clients of the Client, of any type or form in any stage of actual or anticipated research and development;

f.    'Production Processes' which includes processes used in the creation, production and manufacturing of the work product of the Client, including but not limited to, formulas, patterns, molds, models, methods, techniques, specifications, processes, procedures, equipment, devices, programs, and designs;

g.    'Service Information' which includes all data and information relating to the services provided by the Client, including but not limited to, plans, schedules, manpower, inspection, and training information;

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

h.  'Proprietary Computer Code' which includes all sets of statements, instructions or programs of the Client, whether in human readable or machine readable form, that are expressed, fixed, embodied or stored in any manner and that can be used directly or indirectly in a computer ('Computer Programs'); any report format, design or drawing created or produced by such Computer Programs; and all documentation, design specifications and charts, and operating procedures which support the Computer Programs;

i.  'Computer Technology' which includes all scientific and technical information or material of the Client, pertaining to any machine, appliance or process, including but not limited to, specifications, proposals, models, designs, formulas, test results and reports, analyses, simulation results, tables of operating conditions, materials, components, industrial skills, operating and testing procedures, shop practices, know-how and show-how;

j.  'Accounting Information' which includes, without limitation, all financial statements, annual reports, balance sheets, company asset information, company liability information, revenue and expense reporting, profit and loss reporting, cash flow reporting, accounts receivable, accounts payable, inventory reporting, purchasing information and payroll information of the Client; and

k.  Confidential Information will also include any information that has been disclosed by a third party to the Client and is protected by a non-disclosure agreement entered into between the third party and the Client.

4.  Confidential Information will not include the following information:

a.  Information that is generally known in the industry of the Client;

b.  Information that is now or subsequently becomes generally available to the public through no wrongful act of the Contractor;

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

c.     Information that the Contractor rightfully had in their possession prior to the disclosure to the Contractor by the Client;

d.     Information that is independently created by the Contractor without direct or indirect use of the Confidential Information; or

e.     Information that the Contractor rightfully obtains from a third party who has the right to transfer or disclose it.

## OBLIGATIONS OF NON-DISCLOSURE

5.     Except as otherwise provided in this Agreement, the Contractor must not disclose the Confidential Information.

6.     Except as otherwise provided in this Agreement, the Confidential Information will remain the exclusive property of the Client and will only be used by the Contractor for the Permitted Purpose. The Contractor will not use the Confidential Information for any purpose that might be directly or indirectly detrimental to the Client or any of its affiliates or subsidiaries.

7.     The obligations to ensure and prevent the disclosure of the Confidential Information imposed on the Contractor in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and will continue for a period of two (2) years from the date of such expiration or termination.

8.     The Contractor may disclose any of the Confidential Information:

a.     to such of their employees, agents, representatives, and advisors that have a need to know for the Permitted Purpose provided that:

i.     the Contractor has informed such personnel of the confidential nature of the Confidential Information;

ii.    such personnel agree to be legally bound to the same burdens of non-disclosure and non-use as the Contractor;

NC G

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

    iii.    the Contractor agrees to take all necessary steps to ensure that the terms of this Agreement are not violated by such personnel; and

    iv.    the Contractor agrees to be responsible for and indemnify the Client for any breach of this Agreement by their personnel.

    b.    to a third party where the Client has consented in writing to such disclosure; and

    c.    to the extent required by law or by the request or requirement of any judicial, legislative, administrative, or other governmental body.

## AVOIDING CONFLICT OF OPPORTUNITIES

9.    It is understood and agreed that any business opportunity relating to or similar to the Client's current or anticipated business opportunities coming to the attention of the Contractor during the Contractor's retainer is an opportunity belonging to the Client. Accordingly, the Contractor will advise the Client of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Client.

10.    Without the written consent of the Client, the Contractor further agrees not to:

    a.    solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Client; and

    b.    directly or indirectly, engage or participate in any other business activities which the Client, in its reasonable discretion, determines to be in conflict with the best interests of the Client.

NG

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AAB5B78748B0

## NON-SOLICITATION

11.  The Contractor, their affiliates, subsidiaries, and representatives will not, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, directly or indirectly, employ or solicit for employment any person who is now employed or retained by the Client or any affiliate of the Client without the prior written consent of the Client, which consent may not be unreasonably withheld.

## NON-COMPETITION

12.  Other than through employment with a bona-fide independent party, or with the express written consent of the Client, which will not be unreasonably withheld, the Contractor will not, during the continuance of this Agreement or within five (5) years after the termination or expiration, as the case may be, of this Agreement, be directly or indirectly involved with a business which is in direct competition with the particular business line of the Client that the Contractor was working during any time in the last year of retainer with the Client.

13.  For a period of five (5) years from the date of termination or expiration, as the case may be, of the Retainer, the Contractor will not divert or attempt to divert from the Client any business the Client had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Retainer.

## OWNERSHIP AND TITLE

14.  The Contractor acknowledges and agrees that all rights, title, and interest in any Confidential Information will remain the exclusive property of the Client. Accordingly, the Contractor specifically agrees and acknowledges that the Contractor will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trademarks, or trade names, notwithstanding the fact that the Contractor may have created or contributed to the creation of the same.

15.  The Contractor does hereby waive any moral rights that the Contractor may have with respect to the Confidential Information.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

16. The Confidential Information will not include anything developed or produced by the Contractor during the term of this Agreement, including but not limited to intellectual property, process, design, development, creation, research, invention, know-how, trade name, trademarks or copyright that:

    a.    was developed without the use of any equipment, supplies, facility or Confidential Information of the Client;

    b.    was developed entirely on the Contractor's own time;

    c.    does not relate to the actual business or reasonably anticipated business of the Client;

    d.    does not relate to the actual or demonstrably anticipated processes, research or development of the Client; and

    e.    does not result from any work performed by the Contractor for the Client.

17. The Contractor agrees to immediately disclose to the Client all Confidential Information developed in whole or in part by the Contractor during the term of the Retainer and to assign to the Client any right, title or interest the Contractor may have in the Confidential Information. The Contractor agrees to execute any instruments and to do all other things reasonably requested by the Client (both during and after the term of the Retainer) in order to vest more fully in the Client all ownership rights in those items transferred by the Contractor to the Client.

## REMEDIES

18. The Contractor agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause irreparable injury to the Client. Accordingly, the Contractor agrees that the Client is entitled to, in addition to all other rights and remedies available to it at law or in equity, an injunction restraining the Contractor and any agents of the Contractor, from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## RETURN OF CONFIDENTIAL INFORMATION

19.    The Contractor agrees that, upon request of the Client, or in the event that the Contractor ceases to require use of the Confidential Information, or upon expiration or termination of this Agreement, or the expiration or termination of the Retainer, the Contractor will turn over to the Client all documents, disks or other computer media, or other material in the possession or control of the Contractor that:

        a.    may contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

        b.    is connected with or derived from the Contractor's services to the Client.

## NOTICES

20.    In the event that the Contractor is required in a civil, criminal or regulatory proceeding to disclose any part of the Confidential Information, the Contractor will give to the Client prompt written notice of such request so the Client may seek an appropriate remedy or alternatively to waive the Contractor's compliance with the provisions of this Agreement in regard to the request.

21.    If the Contractor loses or makes unauthorized disclosure of any of the Confidential Information, the Contractor will immediately notify the Client and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

22.    Any notices or delivery required in this Agreement will be deemed completed when hand- delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the parties at the addresses contained in this Agreement or as the parties may later designate in writing.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number    DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

23.  The address for any notice to be delivered to any of the parties to this Agreement is as follows:

    a.   Power Play Hockey, LLC:
        60 Lowell St., Salem, NH 03079

    b.   Nolan Gauthier:
        318, West Boylston, MA 01583

## REPRESENTATIONS

24.  In providing the Confidential Information, the Client makes no representations, either expressly or impliedly as to its adequacy, sufficiency, completeness, correctness, or its lack of defect of any kind, including any patent or trademark infringement that may result from the use of such information.

## TERMINATION

25.  This Agreement will automatically terminate on the date that the Contractor's Retainer with the Client terminates or expires, as the case may be. Except as otherwise provided in this Agreement, all rights and obligations under this Agreement will terminate at that time.

## ASSIGNMENT

26.  Except where a party has changed its corporate name or merged with another corporation, this Agreement may not be assigned or otherwise transferred by either party in whole or part without the prior written consent of the other party to this Agreement.

## AMENDMENTS

27.  This Agreement may only be amended or modified by a written instrument executed by both the Client and the Contractor.



Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## GOVERNING LAW

28.  This Agreement will be construed in accordance with and governed by the laws of New Hampshire.

## GENERAL PROVISIONS

29.  Time is of the essence in this Agreement.

30.  This Agreement may be executed in counterparts.

31.  Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

32.  The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

33.  The Contractor is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Client in enforcing this Agreement as a result of any default of this Agreement by the Contractor.

34.  The Client and the Contractor acknowledge that this Agreement is reasonable, valid and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the intention of the Client and the Contractor that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the intention of the Contractor to give the Client the broadest possible protection against disclosure of the Confidential Information.

35.  No failure or delay by the Client in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.



Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

36. This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Client and the Contractor.

37. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

IN WITNESS WHEREOF Power Play Hockey, LLC and Nathan Gauthier have duly affixed their signatures under hand and seal on this 9th day of January, 2024.

**CLIENT SIGNATURES:**

*Shawn Connors*

Shawn Connors, CEO
Power Play Hockey, LLC

*John D. Kula, Jr.*

John D. Kula, Jr., CFO
Power Play Hockey, LLC

**CONTRACTOR SIGNATURE:**

DocuSigned by:

*Nolan*

E1E25D044A1B435...

Nolan Gauthier
Division Head

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

# EXHIBIT B

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

# RESTRICTIVE COVENANTS AGREEMENT

**THIS RESTRICTIVE COVENANTS AGREEMENT** (the "Agreement")

dated this January 9, 2024.

(the "Execution Date"),

BETWEEN:

Power Play Hockey, LLC of 60 Lowell Rd., Salem, NH 03079

(the "Employer")

- AND -

Nolan Gauthier of 318, West-Boylston, MA 01583

(the "Contractor")

## BACKGROUND:

1.  The Contractor is currently or may be employed as a Contractor with the Employer for the
    position of: Division Head. In addition to this responsibility or position (the "Contractor"),
    this Agreement also covers any position or responsibility now or later held with the
    Employer.

2.  The Contractor will receive from the Employer, or develop on behalf of the
    Employer, Confidential Information as a result of the Employment (the 'Permitted
    Purpose').

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B76748B0

IN CONSIDERATION OF and as a condition of the Employer employing the Contractor and the Employer providing the Confidential Information to the Contractor in addition to other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

## CONFIDENTIAL INFORMATION

1.    In connection with this Agreement, Company may provide Contractor (directly or through third parties) with information identified as confidential to enable Contractor to render the services hereunder, or Contractor may develop confidential information for Company.  The term "Confidential Information" includes all Company information furnished to Contractor or to which access is provided by Company to Contractor orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential".  Confidential Information also includes all customer and business information and all other information of any kind and nature in Company databases and systems to which the Contractor is provided access. Contractor recognizes and acknowledges that all such information is of a confidential nature and is a valuable and unique asset of Company's business. Contractor agrees (i) to treat as secret and confidential all such information whether or not identified by Company as confidential.

2.    Contractor acknowledges that the relationships of the Company with its employees, customers and vendors are valuable business assets and the identity of, and relationships with, such parties are proprietary and constitute Confidential Information.  Contractor agrees that, while the provisions of this Section 3(b) are in force Contractor will not directly or indirectly (for himself or for any third party) divert, circumvent, or attempt to divert or circumvent, from the Company any business, employee, customer, or vendor, through solicitation or otherwise.

## INDEPENDENT CONTRACTOR

1.    Contractor is acting as an independent contractor in performing the services hereunder. Nothing contained herein or done in pursuance of this Agreement shall constitute a joint venture, partnership, or agency for the other for any purpose or in any sense and neither party shall have the right to make any warranty or representation to such effect or to bind the other party.

## REPRESENTATIONS AND WARRANTIES

1.    Contractor represents and warrants on the Effective Date (as defined below) and during the Term that he is subject to no restrictions, contractual or otherwise (including, without limitation, non-competition, non-disclosure, and non-use restrictions) which are inconsistent with, or which could reasonably be expected to otherwise adversely affect the performance by the Contractor of the services as contemplated by this Agreement.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA65B78748B0

## TERM AND TERMINATION

1. The term of this Agreement shall begin on January 9, 2024 (the "Effective Date"). This Agreement may be terminated by mutual agreement or by either party for any reason upon ten (10) days' notice to the other. The provisions of Section 3(a) and 3(b) shall survive any termination of this Agreement for a period of one (1) year. Upon termination, the Contractor shall return all Company property in his possession including, but not limited to, keys, access cards, electronic devices, and confidential information.

## DISPUTES; APPLICABLE LAW

1. It is agreed that any breach of the terms of this Agreement would cause significant harm to the Company and that monetary damages alone would be insufficient to compensate for the loss incurred by the Company. Therefore, in addition to any monetary damages, the Company shall be entitled to equitable relief by way of injunction (without the need of posting a bond or other equivalent security) as a remedy for any such breach or threatened breach. Such remedy shall not be deemed to be an exclusive remedy but shall be in addition to all other remedies available to the Company for all damages, costs and expenses incurred by it in this regard. This agreement shall be construed and governed in accordance with the laws of the State of New Hampshire without regard to its choice of law rules.

## OTHER PROVISIONS

1. Entire Agreement. This Agreement (including any schedules and exhibits attached hereto) constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement supersedes any and all prior and contemporaneous agreements, oral or written, between the parties with respect to the subject matter hereof.

2. Severability. If any provision of this Agreement is for any reason declared to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall be unaffected. Any such invalid or unenforceable provision shall be deemed modified to the extent necessary to render it valid and enforceable, and if no modification shall render it valid and enforceable, this Agreement shall be construed as if not containing such provision and the rights and obligations of the parties shall be construed and enforced accordingly.

3. Consents. Contractor consents to background check and use of his name and background information in any Company materials.

4. Amendment, Waiver, Modification or Termination. No amendment, waiver, or termination or modification of this Agreement shall be binding unless it is in writing and, in all cases other than termination, signed by both parties.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
          DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

5.    <u>Assignment.</u>  Neither this Agreement nor any or all of the rights and obligations of the parties hereunder shall be assignable by either party without the prior written consent of the other party, except that Company may assign to any affiliate.

6.    <u>Successors and Assigns; Notice; Counterparts.</u>  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, and, to the extent permitted by subsection (e) above, successors and assigns of the parties hereto.  Any notice provided for in this Agreement must be in writing and must be either (i) personally delivered, (ii) mailed by registered or certified first-class mail, prepaid with return receipt requested, or (iii) sent by a recognized overnight courier service to the recipient at the address indicated in the first paragraph.  This Agreement may be executed in multiple counterparts by facsimile or otherwise and each counterpart shall be deemed an original and all such counterparts shall constitute the same agreement.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement on the date hereinbefore first written.

Employer Signatures :

*Shawn Connors*

Shawn Connors, CEO

Power Play Hockey, LLC

*John D. Kula, Jr.*

John D. Kula, Jr., CFO

Power Play Hockey, LLC

Contractor Signature :

Nolan Gauthier

Division Head

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number

# EXHIBIT C

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number



# Division Head – Job Description & SOP

**Power Play Hockey League (PPHL)**

---

## Position Title:

Division Head

## Reports To:

Regional Manager

## Position Type:

Part-Time, Compensation Plan: Compensation is given in the sum of or up to one season player fee. This compensation will also be extended to tournament play for up to the cost of each tournament a PPHL employee attends.

For example: Season Fee: $485 (3 Seasons per year)

Tournament Fee: Battle of the Branches: $250; Puzzle Cup: $125; Other Tournaments may vary in costs.

Yearly Division Head Base Compensation: $1,455

2x Tournaments Attended Compensation: $375

**Total Compensation: $1,830**

*Players are compensated as a payment towards these fees. In some cases, additional or total compensation will be paid directly to PPHL Division Heads.*

---

## Mission Statement

The mission of the Power play Hockey League (PPHL) is to attract adult hockey players of all levels and provide them with a great experience on and off the ice. Division Heads

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number



are vital to this mission by maintaining smooth operations of weekly games and ensuring a strong line of communication between players and the PPHL office.

Division Head Overview

The Division Head serves as the "boots on the ground" representative of the Power Play Hockey League (PPHL) and plays a critical role in the day-to-day execution of league operations within their assigned division. Ideally, the Division Head is an active player within their division and possesses a strong ability to familiarize themselves with the teams and participants.

This position is primarily responsible for the supervision and coordination of weekly games, team communications, ongoing player and team recruitment, retention efforts, registration management, incident documentation, and overall in-division operational execution. Division Heads act as the direct liaison between players, team captains, and PPHL Management, particularly in instances where a Regional Manager is unavailable.

Division Heads are expected to work closely with their Regional Manager to ensure alignment on all operational priorities and league standards.

Division Heads are expected to maintain an active and visible presence at their assigned rink(s), including attending games and activities that may fall outside of their own team's schedule.

This document is the property of the Power Play Hockey League (PPHL). Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be enforced by law. A separate document signed by each division head (restricted covenants agreement, non-solicitation, non-disclosure, and non-compete period of 24 months from the end of employment shall apply. Violations will result in legal action and financial penalties to recover damages per the signed contract.

## Key Responsibilities & Duties

### 1. Registration

- Ensure all captains register their teams and full rosters at least **three weeks prior** to the start of each season.
- Be physically present at rinks for the **first two weeks** of each new season for live registration support.

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number



- Confirm that all captains understand **players must be registered before Week 1**. Unregistered players are not allowed on the ice.
- If a player appears in Week 1 unregistered, they must register immediately. If not completed by Week 2, they may not play.
- **No players are allowed on the ice Week 2** if they were previously warned and failed to register.

**Access to Proprietary Information**

Division Heads will be provided access to our back end (SportsEngine, Crossbar, Avario, Horizon Web Ref, and any other software), which includes but not limited to, Names, Emails, Phone Numbers, Addresses, and financial/payment information for every team within the division(s) that a division head oversees. This includes rink contacts, management, and all operational aspects of rink management for each rink in our league. Additionally, access to referees, assignors, and scorekeepers are considered proprietary information. Any other access given to contacts of the league would be included in this proprietary information. This proprietary access/data falls under the restricted covenants, non-disclosure, and non-compete signed by each division head at PPHL. This information could cause grave harm to the league if it is used improperly, but it is necessary to ensure a division head can establish communication, monitor team progress, and maintain accurate oversight of each team's participation and compliance throughout the season.

## 2. Financial Oversight

- **ALL Financial compliance, questions, concerns, and discrepancies should be sent to your Regional Manager as soon as possible.**

## 3. Compliance, Roster Accuracy & Disciplinary Oversight

- Issues regarding players or teams posing health/safety concerns, frequent ejections, or displaying negative behavior about the league must be escalated within 24 hours to your Regional Manager.
- **OFF-ICE INCIDENTS:** The PPHL Regional Manager and Owners, collectively, will handle formal removals; on-ice incidents should be communicated to the regional Managers ONLY, and otherwise are not Division Head's responsibility. The Division Head's responsibility is to document and report incidents accurately and promptly. Incident reports *may* be necessary, given the incident, and are evaluated or expected on a case-by-case basis.
- Division Heads are strongly encouraged to regularly check in with their Regional Managers to ensure roster accuracy and to stay informed about any players who are ineligible to participate. This includes players who are suspended, have

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number



outstanding payments, are not rostered appropriately based on parity considerations, or for any other reason deemed inappropriate for ice participation.
- Before asking any player to leave the ice, Division Heads must consult their Regional Manager for approval and support. If a Division Head does not feel comfortable addressing the player directly, they should immediately report the incident to their Regional Manager with specific details, including the date, time, and nature of the issue.

## 4. Weekly Operations

- Maintain communication with your Regional Manager on a weekly basis
- Maintain communication with your teams, captains, and players on a weekly basis
- Attend and participate in **division head and management meetings**. These meetings run at a minimum 1x per season. Your feedback is expected and valued.
- Stay up to date with SOP. You will be notified when updates occur.

## 5. Customer Service & Retention

- Perform **check-ins with all teams four weeks before the next season** and report findings to the office.
- Assist in resolving any concerns teams may have to increase retention.
- Work collaboratively with the Regional Manager to strategize on keeping retention rates high and improving customer satisfaction.

## 6. Communication & Customer Service

- Be proactive in responding to team questions about schedules, player eligibility, payments, etc.
- Communicate any operational issues to the office as they arise.
- Attend weekly games and provide in-person support to teams and referees.

## 7. Legal Safeguards

This document is the property of the Power Play Hockey League (PPHL). By signing the restricted covenants, non-compete, and non-disclosure agreements, or accepting this role, the Division Head agrees to the terms and responsibilities outlined in those agreements. Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be

Date Filed 7/3/2025 11:20 AM
Superior Court - Worcester
Docket Number



enforced by law. Violations will result in legal action and financial penalties to recover damages.

See Power Play Hockey League (PPHL) New Hire Restrictive Covenant agreement, non-compete, and non-disclosure agreements provided in a separate document. You must sign a copy upon hire and/or revision.

Your signed copy will be held in PPHL records.

This position strictly prohibits:

- Soliciting PPHL players, captains, teams, referees, back end companies (SportsEngine or Crossbar, and other systems PPHL uses to manage the league), or rink partners, vendors, and other companies associated with PPHL.
- Creating or supporting a competing adult recreational hockey league within any region PPHL operates for a period of 2 full years (or 24 months) after departure.
- Using or disclosing proprietary league systems, documents, or internal communications.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

## E-Filed

IMMEDIATE REVIEW REQUESTED

### COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                          SUPERIOR COURT DEPARTMENT

|  |  |
|---|---|
| POWER PLAY HOCKEY, LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    Civil Action No. 25 CV 892 D |
| | ) |
| NOLAN GAUTHIER and NON- | ) |
| COMPETE HOCKEY LEAGUE, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF POWER PLAY HOCKEY, LLC'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Power Play Hockey, LLC ("Power Play"), by and through its attorneys, Devine Millimet & Branch, P.A., submits this *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction. Through its motion, Power Play respectfully requests that this Honorable Court enjoin Defendants Non-Compete Hockey League and Nolan Gauthier from operating the Non-Compete Hockey League or taking any other restricted action under the subject Non-Disclosure Agreement or Restrictive Covenants Agreement.

Power Play refers to the accompanying Memorandum of Law and Verified Complaint in further support of the instant motion.

WHEREFORE, Plaintiff Power Play Hockey, LLC respectfully requests that this Honorable Court:

    A. Issue a Temporary Restraining Order and Preliminary Injunction restraining Defendants Nolan Gauthier and Non-Compete Hockey League from operating the

1

Non-Compete Hockey League or taking any other restricted action under the Agreements;

B.  Award reasonable costs and attorney's fees incurred in bringing this motion pursuant to Section 33 of the Non-Disclosure Agreement; and

C.  Grant such other relief it deems to be just and fair under the circumstances.

Respectfully submitted,
Plaintiff,
**POWER PLAY HOCKEY, LLC**
By its attorneys,

Dated: July 3, 2025

*/s/ Jeffrey D. Adams*
Jeffrey Adams (BBO No. 662697)
Joseph Prive (BBO No. 710191)
**DEVINE MILLIMET & BRANCH, P.A.**
111 Amherst Street
Manchester, New Hampshire
(603) 669-1000
jadams@devinemillimet.com
jprive@devinemillimet.com

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

# E-Filed

**IMMEDIATE REVIEW REQUESTED**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                    SUPERIOR COURT DEPARTMENT

|  |  |  |
|---|---|---|
| POWER PLAY HOCKEY, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 25CV892 D |
| | ) | |
| NOLAN GAUTHIER and NON- | ) | |
| COMPETE HOCKEY LEAGUE, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF POWER PLAY HOCKEY, LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Power Play Hockey, LLC ("Power Play"), by and through its attorneys, and

pursuant to Superior Court Rule 9A(d)(1) and Superior Court Standing Order 1-23, submits this

Memorandum of Law in support of its *Ex Parte* Motion for Temporary Restraining Order and

Preliminary Injunction. Through its motion, Power Play respectfully requests that this Honorable

Court enjoin Defendants Non-Compete Hockey League ("NCHL") and Nolan Gauthier

(collectively, "Defendants") from operating NCHL or taking any other restricted action under the

subject Non-Disclosure Agreement (the "NDA") or Restrictive Covenants Agreement (the

"RCA," with the NDA the "Agreements"), copies of which are attached as Exhibits A and B.[1]

---

[1] The Agreements are governed by New Hampshire law. *See* NDA § 28.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

Power Play makes the below factual statements, with reference to Power Play's accompanying

Verified Complaint ("Compl.").[2]

## **BACKGROUND**

Power Play operates "Power Play Hockey League," the fastest growing, veteran-owned

adult hockey league in New Hampshire and Massachusetts. Compl. ¶ 10. Power Play has run

hockey leagues in Massachusetts for nearly eight years, where it operates in 40 facilities, including

in Worcester. *Id.* ¶11.

From around 2019 to 2024, Gauthier was a player and league administrator for Power Play.

*Id.* ¶12.  On or around January 9, 2024, Power Play and Gauthier agreed that Gauthier would

perform the services of Power Play Division Head in exchange for valuable consideration, *id.* ¶

13, and subject to, among other things, the terms and conditions of two (2) valid and binding

agreements: (1) the Non-Disclosure Agreement ("NDA"); and (2) a Restrictive Covenants

Agreements ("RCA") (collectively, the "Agreements").  *See* Exhibits A-B.

The terms of Gauthier's compensation were clearly communicated to Gauthier before he

executed the Agreements and are set forth in the Power Play document titled "Division Head – Job

Description & SOP" (the "Job Description"), a copy of which is attached hereto as Exhibit C. *Id.*

¶ 14. The terms include:

> Part-Time, Compensation Plan: Compensation is given in the sum of or up to
> one season player fee.  This compensation will also be extended to tournament
> play for up to the cost of each tournament a PPHL employee attends.
>
> For example: Season Fee: $485 (3 Seasons per year)
>
> Tournament Fee: Battle of the Branches: $250; Puzzle Cup: $125; Other
> Tournaments may vary in costs.

---

[2] A temporary restraining order may be based on "specific facts shown by affidavit or by the verified complaint."
Mass. R. Civ. P. 65(a).

2

Yearly Division Head Base Compensation: $1,455

2x Tournaments Attended Compensation: $375

**Total Compensation: $1,830** (emphasis in the original).

The Job Description further defines the responsibilities and obligations of a Division Head and specifically states the following:

> …Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be enforced by law. A separate document signed by each division head (restricted covenants agreement, non-solicitation, non-disclosure, and non-compete period of 24 months from the end of employment shall apply. Violations will result in legal action and financial penalties to recover damages per the signed contract…)

A. **Non-Disclosure Agreement ("NDA")**

In exchange for the above services provided by Gauthier as Division Head, Gauthier agreed to be bound by the terms of the NDA, which survive the termination of Gauthier's engagement with Power Play and prohibits him from engaging in certain conduct both during and after the termination of his contract with Power Play with respect to Power Play's confidential information and with respect to competition adverse to Power Play. *Id.* ¶ 17. Specifically, the NDA restrains Gauthier, for a period of two (2) years from the termination of the NDA, from disclosing confidential information and obligates him to undertake good faith efforts to prevent disclosure of same. The NDA terminates automatically on the date Gauthier's retention by Power Play ceases. *Id.* ¶ 18.

Section 3 of the NDA defines "Confidential Information" as all data and information relating to the business and management of Power Play, including, but not limited to: Customer Information, Intellectual Property, Marketing and Development Information, Business Operations, Product Information, Production Processes, Service Information, Proprietary Computer Code,

3

Computer Technology, and Accounting Information ("Confidential Information"). *Id.* ¶ 19. Under

the NDA, Gauthier specifically agreed to the following:

    a.  the Confidential Information was and would remain the exclusive property of Power Play and would be used by Gauthier only for the specifically defined "Permitted Purpose" (Section 6) under the NDA. Gauthier agreed that he would not use the Confidential Information for any purpose that might be directly or indirectly detrimental to Power Play (Sec. 6).

    b.  any current or anticipated business opportunities similar to that of Power Play that came or would come to Gauthier's attention was and is an opportunity belonging to Power Play, and that Gauthier would (1) advise Power Play of such opportunity(ies) and (2) not pursue the opportunity, directly or indirectly, without Power Plays' written consent (Sec. 9).

    c.  not to solely or jointly join any planning for or organization of a business activity in competition with Power Play, including those which Power Play determines to be in conflict with its best interests (Sec. 10).

    d.  for five (5) years after the termination or expiration of the NDA, not be directly or indirectly involved with a business which is in direct competition with Power Play, and that during the same five (5) year period, to not divert or attempt to divert from Power Play any business that Power Play has enjoyed, solicited, or attempted to solicit, from Power Play's customers (Sections 12-13).

Section 18 of the NDA sets forth Power Play's remedies in the event of Gauthier's default

on his obligations:

The Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause *irreparable injury* to [Power Play]. Accordingly, [Gauthier agrees] that [Power Play] is entitled to, in addition to all other rights and remedies available to it at law or in equity, *an injunction restraining [Gauthier] and any agents of [him], from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.* (emphasis added).

And Section 33 of the NDA states that Gauthier is liable for all costs, expenses and expenditures

including, and without limitation, the complete legal costs incurred by Power Play in enforcing

this Agreement as a result of any default of this Agreement by Gauthier. *Id.* ¶ 22.

4

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

**B.  Restrictive Covenant Agreement ("RCA")**

Section 1 of the RCA defines, in all material ways consistent with the NDA, that "Confidential Information" means:

> [Power Play] information furnished to [Gauthier] or to which access is provided to [him] by [Power Play] orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential". Confidential Information also includes all customer and business information and all other information of any kind and nature in [Power Play] databases and systems to which [Gauthier is] provided access.

Under Section 1 of the RCA, Gauthier acknowledged that such Confidential Information is a valuable and unique asset of Power Play's business and agreed to treat as secret and confidential all such information whether or not identified by Power Play as such. *See* Compl. ¶ 25. Under Section 2 the RCA, Gauthier acknowledged that the relationships of Power Play with its employees, customers and vendors are valuable business assets and the identify of, and relationships with, such parties are proprietary and constitute Confidential Information. Thereunder, Gauthier agreed that he would not directly or indirectly (for himself or for any third party) divert, circumvent, or attempt to divert or circumvent, from Power Play any business, employee, customer, or vendor, through solicitation or otherwise. *Id.* ¶26.

The RCA further provides that in the event of Gauthier's default on any obligation under the RCA, Power Play would be entitled to injunctive relief and that such remedy shall not be deemed to be an exclusive remedy but shall be in addition to all other remedies available to Power Play for all damages, costs and expenses incurred by Power Play. *Id.* ¶ 27.

**C.  Gauthier's Willful Breach of NDA and RCA and Related Actionable Conduct**

Despite the express and unambiguous terms contained in the Agreements, Gauthier willfully breached the Agreements when, on or around May 7, 2025, he started the NCHL that directly competes with Power Play. *Id.* ¶ 30. In creating NCHL, he misappropriated Confidential

5

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams from Power Play to participate in NCHL. *Id.* ¶ 31. To date, Gauthier, by and through NCHL, stole not less than six (6) hockey teams from Power Play to the NCHL, thereby wrongfully depriving Power Play of not less than $100,000 in revenue. *Id.* ¶ 32. Gauthier, by and through NCHL, committed and is committing these actions substantially with the use of Power Play's Confidential Information. *Id.* ¶ 33.

Gauthier has used the contact information of players and team captains to wrongfully solicit players, captains, and teams from Power Play to NCHL. *Id.* ¶ 34. But for Gauthier's wrongful use of Power Play's Confidential Information in this manner, such players, captains, and teams would still be engaged with Power Play. *Id.* ¶ 35. That Gauthier's breach and related conduct was knowing, willful, and malicious is underscored by the league name, "Non-Compete Hockey League," which intentionally invokes the very obligations under the Agreements that he flagrantly disregarded and continues to disregard. *Id.* ¶ 36.

In order to play hockey with Power Play, a team pays in total approximately $15,000. This figure comprises a $500 per play fee to cover reasonable and necessary provisions, venues, and administration of hockey games and league play at an above average industry standard by Power Play. *Id.* ¶ 38. Insofar as Gauthier, by and through NCHL, has converted not less than six (6) teams from Power Play, the actual loss—that is, direct damages, not accounting for consequential or benefit of the bargain damages—in the form of revenue of which Power Play has been wrongfully deprived by Defendants is not less than $100,000. *Id.* ¶ 39.

6

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

## ARGUMENT

### I.    A TEMPORARY RESTRAINING ORDER SHOULD ISSUE IMMEDIATELY BECAUSE POWER PLAY WILL SUFFER IRREPARABLE HARM BEFORE DEFENDANTS CAN BE HEARD

"Trial judges have broad discretion to grant or deny injunctive relief." *Robinhood Fin., LLC v. Galvin*, No. 2084CV00884BLS2, 2021 WL 5626410, at *2 (Mass. Super. May 27, 2021) (quoting *Lightlab Imaging, Inc.* v. *Axsun Technologies, Inc.*, 469 Mass. 181, 194 (2014)). Pursuant to Rule 65(a) of the Massachusetts Rules of Civil Procedure:

> A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition.

As a result of Gauthier's breach of the Agreements and creation of the NCHL, Power Play has already sustained over $100,000 in damages and it continues to sustain additional monetary damages on a weekly basis. If Defendants are not immediately enjoined from operating the NCHL, Power Play will continue to sustain non-economic damages including reputational risk and the potential for present hockey teams leaving Power Play to join the NCHL. Moreover, based on Gauthier's past and present use of Power Play's Confidential Information, it is likely that he will continue in his efforts to steal teams from Power Play in an attempt to grow the NCHL.

Notably, Gauthier, through his execution of the NDA, expressly agreed that:

> The Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause ***irreparable injury*** to [Power Play]. Accordingly, [Gauthier agrees] that [Power Play] is entitled to, in addition to all other rights and remedies available to it at law or in equity, ***an injunction restraining*** [Gauthier] and any agents of [him], from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

7

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

*See* <u>Exhibit A</u> at Section 18 (emphasis added). Gauthier, through his use of the Confidential Information to form the NCHL, pursued and formed a competing hockey league that he knew would be detrimental to Power Play, in further violation of the Agreements.

Therefore, based on Gauthier's express agreement contained in Section 18 of the NDA that this Court should enter an injunction restraining him and NCHL from operating a competing hockey league, it is appropriate for this Court to immediately enter a TRO followed by a permanent injunction.[3]

## II.    POWER PLAY IS ENTITLED TO A PRELIMINARY INJUNCTION BASED ON GAUTHIER'S BREACH OF THE AGREEMENTS

To be entitled to a preliminary injunction, the movant must show: (i) that success is likely on the merits; (ii) that if the injunction is denied, the moving party faces a substantial risk of irreparable harm; and (iii) that this risk of irreparable harm, considered in light of the moving party's chances of prevailing on the merits, outweighs the nonmoving party's probable harm. *See Abner A.* v. *Mass. Interscholastic Athletic Ass'n*, 490 Mass. 538, 545 (2022) (quotation omitted). In an appropriate case, "the risk of harm to the public interest also may be considered." *Velazquez* v. *Eye Health Assocs., LLC*, No. 2014-693, 2014 WL 7466732, at *3 (Mass. Super. Oct. 1, 2014) (quotation omitted); *LeClair* v. *Town of Norwell*, 430 Mass. 328, 332 (1999) ("[T]he judge should specifically consider how [a] statutory violation affects the public interest."). Based on the Verified Complaint, the exhibits thereto, and the conduct of Defendants, the entry of a preliminary injunction is merited.

---

[3] The immediate nature of Power Play's risk of irreparable harm is demonstrated in Section II.C herein.

8

### A. Power Play is Likely to Succeed on the Merits of Its Causes of Action Against Defendants

"[L]ikelihood of success is the touchstone of the preliminary injunction inquiry." *Foster* v. *Commissioner of Correction*, 488 Mass. 643, 651 (2021) (citation and quotation omitted). Here, in addition to seeking injunctive relief, Power Play is advancing causes of action against Defendants for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, violation of the N.H. Uniform Trade Secret Act (R.S.A. 350-B-2), and violation of G.L. c. 93A. Given Defendants violation of the Agreements, misappropriation of Power Play's Confidential Information, and unfair and deceptive conduct, Power Play is likely to succeed on the merits of these causes of action against Defendants.

#### 1. *Breach of Contract (Count II) & Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III)*

The Agreements are valid, binding and enforceable contracts that Gauthier breached and, as a result, Defendants have caused Power Play substantial monetary damages and injuries to its reputation.

To prevail on a breach of contract claim, a plaintiff must show: (1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage. *Tenants' Dev. Corp.* v. *AMTAX Holdings 227, LLC*, 495 Mass. 207, 222 (2025) (quoting *Singarella* v. *Boston*, 342 Mass. 385, 387 (1961)). "Offer, acceptance and consideration are essential to contract formation." *Chisholm* v. *Ultima Nashua Indus. Corp.*, 150 N.H. 141, 144–45 (2003) (quoting *Tsiatsios v. Tsiatsios*, 140 N.H. 173, 178 (1995). "Consideration is present if there is either a benefit to the promisor or a detriment to the promisee." *Id.* at 145. "In addition, there must be a meeting of the minds in order to form a valid contract. A meeting of the minds is present when the parties assent to the same terms." *Id.* A

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

party to a contract can electronically assent to the terms of an agreement sufficient to create a binding contract if the asset is "absolute" and "precise." *Skinny Pancake-Hanover, LLC* v. *Crotix*, 172 N.H. 372, 378 (2019) (citations and quotations omitted). Further, "[i]n every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another." *Livingston v. 18 Mile Point Drive, Ltd.*, 158 N.H. 619, 624, 972 A.2d 1001 (2009).

On or about January 9, 2024, Power Play and Gauthier entered into valid, enforceable, and binding contracts when they signed the Agreements. *See* Compl. ¶ 53. Under the Agreements, Power Play permitted Gauthier to play hockey in a Power Play Hockey League without cost, as substantial consideration for certain services to be provided by Gauthier, as defined in the Verified Complaint. *Id.* ¶ 54. Specifically, as consideration for serving as a Division Head, Gauthier received from Power Play $1,830 in compensation. *Id.* ¶ 55. In exchange for the consideration given by Power Play, Gauthier agreed to, among other things, perform the duties of a Power Play league Division Head, and in so doing to comply at all relevant times with the terms of the Agreements. *Id.* ¶ 56. Gauthier willfully breached his foregoing obligations under the Agreements when, on or around May 7, 2025, he started the NCHL that directly competes with Power Play. In creating NCHL, he misappropriated Confidential Information that exclusively belongs to Power Play including, but not limited to, misappropriating teams from Power Play to participate in NCHL. *Id.* ¶ 57. The damages sustained by Power Play that directly, foreseeably, and intentionally flow from Gauthier's breach include, but is not necessarily limited to:

    a. Lost revenue amounting to over $100,000 directly resulting from Gauthier's misappropriation of teams and related Confidential Information to which Gauthier obtained access only through his engagement with Power Play;

    b. Reputational harm caused by Gauthier's defamations intended to undermine Power Play's business and to misappropriate teams and players from Power Play; and

    c. Attorney's fees and costs pursuant to Section 33 of the Non-Disclosure Agreement incurred by Power Play to enforce its rights under the Agreements.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

*Id.* ¶ 58.

Moreover, the Agreements are reasonable and enforceable restrictive covenants. In New Hampshire, a restrictive covenant is enforceable if "the restraint is reasonable, given the particular circumstances of the case." *Data Intensity LLC* v. *Spero*, D.N.H., No. 21-CV-781-PB, at *5 (Mar. 25, 2024) (quoting *ACAS Acquisitions (Precitech) Inc.* v. *Hobert*, 155 N.H. 381, 388 (2007)). In determining whether a restrictive covenant is reasonable, courts look to: (1) whether the restriction is greater than necessary to protect the legitimate interests of the employer, (2) whether the restriction imposes an undue hardship upon the employee, and (3) whether the restriction is injurious to the public interest. *Id.* (quoting *ACAS*, 155 N.H. at 389). Legitimate interests of an employer that may be protected from competition include "trade secrets," *ACAS*, 155 N.H. at 389, and "confidential information other than trade secrets," *Contour Design, Inc.* v. *Chance Mold Steel Co.*, D.N.H., No. 09-CV-451-JL (Dec. 16, 2011) (quoting *ACAS*, 155 N.H. at 389) ("Covenants not to compete may serve other legitimate ends as well, including to guard against a competitor's misappropriation of the time and expense the covenantee has invested in developing a product.").

Here, the Agreements do not restrict general competition, *Edwards*, 2007 WL 2840360 at *3-4. Rather, they are narrowly tailored to protect Power Play's trade secrets, *e.g.*, customer lists, team contact information, player data, a goal which is consistent with public policy, and other protected confidential information. *See Aspect Software, Inc.* v. *Barnett*, 787 F. Supp. 2d 118, 130 (D. Mass. 2011) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm.").

For similar reasons, the Agreements do not place any undue hardship on Gauthier. Gauthier specifically agreed to be bound by the NDA's obligations, the material terms of which underscore the sensitive and protected nature of Power Play's Confidential Information to which Gauthier would and did have access to as a Division Head. The NDA obligations do not place any

burdensome or other obligations on Gauthier affecting him outside the narrowly tailored scope of direct or indirect competition with Power Play within the narrow field of adult hockey league services. *See PC Connection, Inc. v. Sillich*, 673 F. Supp. 3d 131, 137 (D.N.H. 2023) ("Restrictive covenants 'not only inure to the benefit of the employer but to the employee as well, in that the latter may, by giving a restrictive covenant, be able to place himself in a more advantageous position economically.'"). Nor does the NDA "*unreasonably* limit the public's right to choose before it will be found to be injurious to the public interest." *Ferrofluidics Corp.* v. *Advanced Vacuum Components, Inc.*, 789 F. Supp. 1201, 1211 (D.N.H. 1992) (citing *Tech. Aid Corp. v. Allen*, 134 N.H. 1, 10-11 (1991)) (emphasis in original). Rather, the NDA reasonably limits Gauthier's ability to unfairly benefit and profit from the Confidential Information Power Play gathered over the course of years providing hockey leagues services in New England. *Id.*

### 2. *N.H. Uniform Trade Secret Act (N.H. R.S.A. 350-B)*

Power Play is likely to succeed on the merits of its claim that Defendants violated the New Hampshire Uniform Trade Secret Act ("UTSA"), and the UTSA permits this Court to enjoin Defendants from their continued misappropriation of Power Play's Confidential Information.

The purpose of the UTSA is to protect trade secrets from being misappropriated and to provide redress in the event of misappropriation. *See generally* RSA ch. 350-B. The UTSA grants courts broad authority to protect trade secrets, expressly stating that a court may enjoin an "[a]ctual or threatened misappropriation," and that "affirmative acts to protect a trade secret may be compelled by court order." RSA 350-B:2, I, III. In the event of a misappropriation, the UTSA provides that the complainant may be entitled to recover damages. RSA 350-B:3, I. If the misappropriation is "willful and malicious" the trial court may award "exemplary damages" up to twice the amount of the actual damage award. RSA 350-B:3, II.; *see also CaremarkPCS Health, LLC v. N.H. Dep't of Admin. Servs.*, 167 N.H. 583, 589 (2015).

12

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

Gauthier is in breach of his contractual obligations under the above-defined Agreements with respect to Power Play's Confidential Information and the restriction against creating leagues that compete with Power Play. *See* Compl. ¶ 80. Power Play's Confidential Information, as defined above and in the Agreements, constitutes trade secrets under the UTSA. *Id.* ¶ 81. Because the Agreements are governed by New Hampshire law, N.H. R.S.A. 350-B:1, *et seq.* governs Gauthier's contract-based misappropriation of trade secrets. *Id.* ¶ 82. Power Play's trade secrets include in large part its business operations processes concerning the administration of adult hockey leagues throughout New England. *Id.* ¶ 83. Power Play's trade secret also includes the contact information, customer habits, and related sensitive and protected information. *Id.* Power Play derives independent economic value from the fact that the Confidential Information is not generally known to other persons who can obtain economic value from its disclosure or use and is the subject of specific efforts to maintain its secrecy. *Id.* ¶ 84. Power Play's reasonable measures to ensure the secrecy of the Confidential Information are manifest throughout the Agreements. *Id.* ¶ 85. Power Play's measures in this regard were and are so well-known to those whom it engages as Division Heads or vendors that Gauthier, in the course of his willful breach and misappropriation, named his improper league by specific reference to said obligations (*e.g.*, the "Non-Compete Hockey League"). *Id.* ¶ 86. But for Gauthier's access to Power Play's trade secrets, Gauthier would not have been able to derive the substantial economic and professional benefit he so derives by, among other things, misappropriating teams, players, and revenues from Power Play. *Id.* ¶ 87. Power Play never consented to Gauthier's disclosure of Power Play's trade secrets, which disclosure occurred and occurs in the regular course of Gauthier's operation of NCHL, and Gauthier acquired Power Play's trade secrets through improper means, to wit, misrepresentation of his intent to comply with his contractual obligations and by willful, knowing, and malicious breach of same. *Id.* ¶¶ 88-89.

Based on the foregoing, Power Plan is likely to succeed on the merits of its claim against Defendants for violation of the UTSA, and, pursuant to N.H. R.S.A. 350-B:2, Power Play is entitled to an order enjoining Gauthier from using or in any way benefiting from Power Play's trade secrets, to include from direct or indirect involvement with a league or related venture that directly competes with Power Play's hockey leagues or related venture.

### 3. *Violation of G.L. c. 93A*

Power Play is likely to succeed on the merits of its claim that Defendants violated G.L. c. 93A through its unfair and deceptive conduct.

General Laws c. 93A, § 2, makes unlawful "unfair or deceptive acts or practices" in the conduct of "any trade or commerce," while § 11 applies these prohibitions to dealings between those "engaged in trade or commerce," giving a private right of action to businesses harmed by another business's unlawful conduct under § 2. To determine what conduct rises to the level of an "unfair" act or practice actionable under G. L. c. 93A, courts have consistently looked to: (1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses. *See HI Lincoln, Inc. v. South Washington Street, LLC*, 489 Mass. 1, 14-15 (20220 (citing *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

Power Play, Gauthier, and NCHL are persons within the meaning of G.L. c. 93A, §§ 1(a) and 11, and at the time of Gauthier's and NCHL's unfair acts and unfair methods of competition, Power Play had and has as its business the provision of services in the form of administration of adult hockey leagues throughout New England, including Massachusetts. *See* Compl. ¶¶ 93-94. Power Play, Gauthier, and NCHL were and are engaged in trade or commerce with each other within the meaning of G.L. c. 93A at the time of Defendants' unfair acts and unfair methods of

14

competition. *Id.* ¶ 95. Specifically, Defendants' unfair acts and deceptive methods of competition began and followed from their use of misappropriated Confidential Information to specifically undermine Power Play's business and to convert customers and clients from Power Play within Massachusetts. *Id.* Defendants' unfair acts and deceptive methods of competition constitute willful and knowing violations of Chapter 93A for the reasons as set forth above, including specifically Gauthier's knowing operations in violation of his non-disclosure and non-competition obligations as embodied by Gauthier calling its improper league the "Non-Compete" league. *Id.* ¶ 96. These unfair acts and deceptive methods of competition substantially took and continue to take place in Massachusetts and Gauthier's threats to so act intentionally exclusively concern actions undertaken in Massachusetts, pursuant to Gauthier's November 14, 2024 email communication to Power Play in which Gauthier informed Power Play that he was "starting my own league in Worcester without PPHL," that he would "take as many teams with [Gauthier] as possible," and that he had "already started the process." *Id.* ¶ 97. As a direct and proximate result of Defendants' Chapter 93A violations, Power Play has suffered damages and continues to so suffer in an amount to be determined at trial. *Id.* ¶ 98.

### B. Power Play Faces Substantial Risk of Immediate and Irreparable Harm if a TRO and Preliminary Injunction Do Not Enter

In addition to the substantial risks of irreparable reputational harm agreed to by the parties in Section 18 of the NDA, the substantial risk of irreparable harm to Power Play is the continuous risk that Gauthier's ongoing efforts to convert Power Play teams, captains, and players will be successful, thus depriving Power Play of its hard-earned goodwill and substantial revenue. *See 7-Eleven, Inc.* v. *Grewal*, 60 F. Supp. 3d 272, 280 (D. Mass. 2014) (injunction to protect quality of brand); *BNY Mellon, N.A.* v. *Schauer*, Mass. Super. No. 201001344BLS1 (May 14, 2010) (quoting *Bear, Stearns & Co., Inc.* v. *Sharon*, 550 F.Sup.2d 174, 178 (D. Mass. 2008)). This risk is

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

immediate, as Gauthier expressly admitted in his November 14, 2024 email to Power Play that he is actively undertaking efforts to convert as many teams, captains, and players as possible on an ongoing basis. *See* Compl. ¶ 37.

The express agreement under Section 18 of the NDA is consistent with New Hampshire and Massachusetts law and the nature of the harm that Power Play has already suffered because of Gauthier's unauthorized use of Power Play's Confidential Information. *Aspect Software*, 787 F. Supp. 2d at 130 (applying Massachusetts law) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm."). In addition to the contractual grounds for finding irreparable harm, Gauthier's ongoing breach is specifically of the nature for which monetary damages cannot adequately compensate. Indeed, Gauthier has misappropriated Confidential Information and, with it, goodwill, as teams and players converted from Power Play to the NCHL league run by Gauthier. Further, in addition to the contractual and plain factual grounds for irreparable harm, the UTSA expressly provides for injunctive relief in cases such as this. *See* N.H. R.S.A. 350-B:2.

### C. **Power Play's Risk of Irreparable Harm Outweighs Defendants Probable Harm**

Any prospective harm to Defendants by an injunction is entirely a creature of Gauther's own willful breach. Simply put, Gauthier maliciously created the rival league, after specifically threatening to do so, to intentionally convert Power Play's business opportunities, goodwill, and revenue. The harm to Power Play, should injunction not be granted, is substantial. Since May 7, 2025, Gauthier's misappropriation scheme has already wrongfully deprived Power Play of revenue and goodwill: six teams have already been converted from Power to Play to NCHL, resulting in over $100,000 in damages to Power Play and additional damages to its reputation. Should injunction not be granted, the probability of continued, snowballing conversion is extremely high.

16

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

On the other hand, any prospective harm to Gauthier, should injunction be granted, would be comparably miniscule given that the NCHL is a part-time job for him. Gauthier is and has been since graduating from college a property manager, with no indication that he intends to further his "Non-Compete" league beyond the harm he can cause Power Play thereby.

## CONCLUSION

WHEREFORE, Plaintiff Power Play Hockey, LLC respectfully requests that this Honorable Court:

A. Issue a Temporary Restraining Order and Preliminary Injunction restraining Defendants Nolan Gauthier and Non-Compete Hockey League from operating the Non-Compete Hockey League or taking any other restricted action under the Agreements;

B. Award reasonable costs and attorney's fees incurred in bringing this motion pursuant to Section 33 of the Non-Disclosure Agreement; and

C. Grant such other relief it deems to be just and fair under the circumstances.

Respectfully submitted,
Plaintiff,
**POWER PLAY HOCKEY, LLC**
By its attorneys,

Dated: July 3, 2025

*/s/ Jeffrey D. Adams*
Jeffrey Adams (BBO No. 662697)
Joseph Prive (BBO No. 710191)
**DEVINE MILLIMET & BRANCH, P.A.**
111 Amherst Street
Manchester, New Hampshire
(603) 669-1000
jadams@devinemillimet.com
jprive@devinemillimet.com

17

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

# EXHIBIT A

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

# NON-DISCLOSURE AGREEMENT

**THIS NON-DISCLOSURE AGREEMENT** (the "Agreement")

dated this day of January 9, 2024.

(the "Execution Date"),

### BETWEEN:

Power Play Hockey, LLC of 60 Lowell Rd., Salem, NH 03079

(the "Client")

### - AND -

Nolan Gauthier of 318, West Boylston, MA 01583

(the "Contractor")

## BACKGROUND:

1.    The Contractor is currently or may be retained as an independent contractor with the Client for the position of: Division Head. In addition to this responsibility or position (the "Contractor"), this Agreement also covers any position or responsibility now or later held with the Client.

2.    The Contractor will receive from the Client, or develop on behalf of the Client, Confidential Information as a result of the Retainer (the 'Permitted Purpose').



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

IN CONSIDERATION OF and as a condition of the Client retaining the Contractor and the Client providing the Confidential Information to the Contractor in addition to other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

## CONFIDENTIAL INFORMATION

1.  All written and oral information and materials disclosed or provided by the Client to the Contractor under this Agreement is Confidential Information regardless of whether it was provided before or after the date of this Agreement or how it was provided to the Contractor.

2.  The Contractor acknowledges that in any position the Contractor may hold, in and as a result of the Contractor's retainer by the Client, the Contractor will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Client and which information is the exclusive property of the Client.

3.  'Confidential Information' means all data and information relating to the business and management of the Client, including but not limited to the following:

    a.  'Customer Information' which includes names of customers of the Client, their representatives, all customer contact information, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by customers of the Client;

    b.  'Intellectual Property' which includes information relating to the Client's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, technical concepts, test data and test results, simulation results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

c.   'Marketing and Development Information' which includes marketing and development plans of the Client, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Client which have been or are being discussed;

d.   'Business Operations' which includes internal personnel and financial information of the Client, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Client's business;

e.   'Product Information' which includes all specifications for products of the Client as well as work product resulting from or related to work or projects performed or to be performed for the Client or for clients of the Client, of any type or form in any stage of actual or anticipated research and development;

f.   'Production Processes' which includes processes used in the creation, production and manufacturing of the work product of the Client, including but not limited to, formulas, patterns, molds, models, methods, techniques, specifications, processes, procedures, equipment, devices, programs, and designs;

g.   'Service Information' which includes all data and information relating to the services provided by the Client, including but not limited to, plans, schedules, manpower, inspection, and training information;

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

h.   'Proprietary Computer Code' which includes all sets of statements, instructions or programs of the Client, whether in human readable or machine readable form, that are expressed, fixed, embodied or stored in any manner and that can be used directly or indirectly in a computer ('Computer Programs'); any report format, design or drawing created or produced by such Computer Programs; and all documentation, design specifications and charts, and operating procedures which support the Computer Programs;

i.   'Computer Technology' which includes all scientific and technical information or material of the Client, pertaining to any machine, appliance or process, including but not limited to, specifications, proposals, models, designs, formulas, test results and reports, analyses, simulation results, tables of operating conditions, materials, components, industrial skills, operating and testing procedures, shop practices, know-how and show-how;

j.   'Accounting Information' which includes, without limitation, all financial statements, annual reports, balance sheets, company asset information, company liability information, revenue and expense reporting, profit and loss reporting, cash flow reporting, accounts receivable, accounts payable, inventory reporting, purchasing information and payroll information of the Client; and

k.   Confidential Information will also include any information that has been disclosed by a third party to the Client and is protected by a non-disclosure agreement entered into between the third party and the Client.

4.   Confidential Information will not include the following information:

a.   Information that is generally known in the industry of the Client;

b.   Information that is now or subsequently becomes generally available to the public through no wrongful act of the Contractor;

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

    c.    Information that the Contractor rightfully had in their possession prior to the disclosure to the Contractor by the Client;

    d.    Information that is independently created by the Contractor without direct or indirect use of the Confidential Information; or

    e.    Information that the Contractor rightfully obtains from a third party who has the right to transfer or disclose it.

## OBLIGATIONS OF NON-DISCLOSURE

5.    Except as otherwise provided in this Agreement, the Contractor must not disclose the Confidential Information.

6.    Except as otherwise provided in this Agreement, the Confidential Information will remain the exclusive property of the Client and will only be used by the Contractor for the Permitted Purpose. The Contractor will not use the Confidential Information for any purpose that might be directly or indirectly detrimental to the Client or any of its affiliates or subsidiaries.

7.    The obligations to ensure and prevent the disclosure of the Confidential Information imposed on the Contractor in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and will continue for a period of two (2) years from the date of such expiration or termination.

8.    The Contractor may disclose any of the Confidential Information:

    a.    to such of their employees, agents, representatives, and advisors that have a need to know for the Permitted Purpose provided that:

        i.    the Contractor has informed such personnel of the confidential nature of the Confidential Information;

        ii.    such personnel agree to be legally bound to the same burdens of non-disclosure and non-use as the Contractor;

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

      iii.    the Contractor agrees to take all necessary steps to ensure that the terms of this Agreement are not violated by such personnel; and

      iv.    the Contractor agrees to be responsible for and indemnify the Client for any breach of this Agreement by their personnel.

  b.    to a third party where the Client has consented in writing to such disclosure; and

  c.    to the extent required by law or by the request or requirement of any judicial, legislative, administrative, or other governmental body.

## AVOIDING CONFLICT OF OPPORTUNITIES

9.    It is understood and agreed that any business opportunity relating to or similar to the Client's current or anticipated business opportunities coming to the attention of the Contractor during the Contractor's retainer is an opportunity belonging to the Client. Accordingly, the Contractor will advise the Client of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Client.

10.    Without the written consent of the Client, the Contractor further agrees not to:

  a.    solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Client; and

  b.    directly or indirectly, engage or participate in any other business activities which the Client, in its reasonable discretion, determines to be in conflict with the best interests of the Client.



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## NON-SOLICITATION

11. The Contractor, their affiliates, subsidiaries, and representatives will not, during the term of this Agreement and for a period of two (2) years after the termination of this Agreement, directly or indirectly, employ or solicit for employment any person who is now employed or retained by the Client or any affiliate of the Client without the prior written consent of the Client, which consent may not be unreasonably withheld.

## NON-COMPETITION

12. Other than through employment with a bona-fide independent party, or with the express written consent of the Client, which will not be unreasonably withheld, the Contractor will not, during the continuance of this Agreement or within five (5) years after the termination or expiration, as the case may be, of this Agreement, be directly or indirectly involved with a business which is in direct competition with the particular business line of the Client that the Contractor was working during any time in the last year of retainer with the Client.

13. For a period of five (5) years from the date of termination or expiration, as the case may be, of the Retainer, the Contractor will not divert or attempt to divert from the Client any business the Client had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Retainer.

## OWNERSHIP AND TITLE

14. The Contractor acknowledges and agrees that all rights, title, and interest in any Confidential Information will remain the exclusive property of the Client. Accordingly, the Contractor specifically agrees and acknowledges that the Contractor will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trademarks, or trade names, notwithstanding the fact that the Contractor may have created or contributed to the creation of the same.

15. The Contractor does hereby waive any moral rights that the Contractor may have with respect to the Confidential Information.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

16. The Confidential Information will not include anything developed or produced by the Contractor during the term of this Agreement, including but not limited to intellectual property, process, design, development, creation, research, invention, know-how, trade name, trademarks or copyright that:

    a.    was developed without the use of any equipment, supplies, facility or Confidential Information of the Client;

    b.    was developed entirely on the Contractor's own time;

    c.    does not relate to the actual business or reasonably anticipated business of the Client;

    d.    does not relate to the actual or demonstrably anticipated processes, research or development of the Client; and

    e.    does not result from any work performed by the Contractor for the Client.

17. The Contractor agrees to immediately disclose to the Client all Confidential Information developed in whole or in part by the Contractor during the term of the Retainer and to assign to the Client any right, title or interest the Contractor may have in the Confidential Information. The Contractor agrees to execute any instruments and to do all other things reasonably requested by the Client (both during and after the term of the Retainer) in order to vest more fully in the Client all ownership rights in those items transferred by the Contractor to the Client.

## REMEDIES

18. The Contractor agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause irreparable injury to the Client. Accordingly, the Contractor agrees that the Client is entitled to, in addition to all other rights and remedies available to it at law or in equity, an injunction restraining the Contractor and any agents of the Contractor, from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## RETURN OF CONFIDENTIAL INFORMATION

19.   The Contractor agrees that, upon request of the Client, or in the event that the Contractor ceases to require use of the Confidential Information, or upon expiration or termination of this Agreement, or the expiration or termination of the Retainer, the Contractor will turn over to the Client all documents, disks or other computer media, or other material in the possession or control of the Contractor that:

  a.   may contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; or

  b.   is connected with or derived from the Contractor's services to the Client.

## NOTICES

20.   In the event that the Contractor is required in a civil, criminal or regulatory proceeding to disclose any part of the Confidential Information, the Contractor will give to the Client prompt written notice of such request so the Client may seek an appropriate remedy or alternatively to waive the Contractor's compliance with the provisions of this Agreement in regard to the request.

21.   If the Contractor loses or makes unauthorized disclosure of any of the Confidential Information, the Contractor will immediately notify the Client and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

22.   Any notices or delivery required in this Agreement will be deemed completed when hand- delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the parties at the addresses contained in this Agreement or as the parties may later designate in writing.

NS G

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

23.  The address for any notice to be delivered to any of the parties to this Agreement is as follows:

    a.    Power Play Hockey, LLC:
            60 Lowell St., Salem, NH 03079

    b.    Nolan Gauthier:
            318, West Boylston, MA 01583

## REPRESENTATIONS

24.  In providing the Confidential Information, the Client makes no representations, either expressly or impliedly as to its adequacy, sufficiency, completeness, correctness, or its lack of defect of any kind, including any patent or trademark infringement that may result from the use of such information.

## TERMINATION

25.  This Agreement will automatically terminate on the date that the Contractor's Retainer with the Client terminates or expires, as the case may be. Except as otherwise provided in this Agreement, all rights and obligations under this Agreement will terminate at that time.

## ASSIGNMENT

26.  Except where a party has changed its corporate name or merged with another corporation, this Agreement may not be assigned or otherwise transferred by either party in whole or part without the prior written consent of the other party to this Agreement.

## AMENDMENTS

27.  This Agreement may only be amended or modified by a written instrument executed by both the Client and the Contractor.



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## GOVERNING LAW

28.   This Agreement will be construed in accordance with and governed by the laws of New Hampshire.

## GENERAL PROVISIONS

29.   Time is of the essence in this Agreement.

30.   This Agreement may be executed in counterparts.

31.   Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

32.   The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

33.   The Contractor is liable for all costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Client in enforcing this Agreement as a result of any default of this Agreement by the Contractor.

34.   The Client and the Contractor acknowledge that this Agreement is reasonable, valid and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the intention of the Client and the Contractor that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the intention of the Contractor to give the Client the broadest possible protection against disclosure of the Confidential Information.

35.   No failure or delay by the Client in exercising any power, right or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers or privileges preclude any further exercise of them or the exercise of any other right, power or privilege provided in this Agreement.



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

36.  This Agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns, as the case may be, of the Client and the Contractor.

37.  This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

IN WITNESS WHEREOF Power Play Hockey, LLC and Nathan Gauthier have duly affixed their signatures under hand and seal on this 9th day of January, 2024.

**CLIENT SIGNATURES:**

*Shawn Connors*
Shawn Connors, CEO
Power Play Hockey, LLC

*John D. Kula, Jr.*
John D. Kula, Jr., CFO
Power Play Hockey, LLC

**CONTRACTOR SIGNATURE:**

DocuSigned by:
*Nolan*
E1E25D044A1B435...
Nolan Gauthier
Division Head

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

# EXHIBIT B

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

# RESTRICTIVE COVENANTS AGREEMENT

**THIS RESTRICTIVE COVENANTS AGREEMENT** (the "Agreement")

dated this January 9, 2024.

(the "Execution Date"),

BETWEEN:

Power·Play Hockey, LLC of 60 Lowell Rd., Salem, NH 03079

(the "Employer")

- AND -

Nolan Gauthier of 318, West Boylston, MA 01583

(the "Contractor")

## BACKGROUND:

1. The Contractor is currently or may be employed as a Contractor with the Employer for the position of: Division Head. In addition to this responsibility or position (the "Contractor"), this Agreement also covers any position or responsibility now or later held with the Employer.

2. The Contractor will receive from the Employer, or develop on behalf of the Employer, Confidential Information as a result of the Employment (the 'Permitted Purpose').



Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

IN CONSIDERATION OF and as a condition of the Employer employing the Contractor and the Employer providing the Confidential Information to the Contractor in addition to other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

## CONFIDENTIAL INFORMATION

1.  In connection with this Agreement, Company may provide Contractor (directly or through third parties) with information identified as confidential to enable Contractor to render the services hereunder, or Contractor may develop confidential information for Company. The term "Confidential Information" includes all Company information furnished to Contractor or to which access is provided by Company to Contractor orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential". Confidential Information also includes all customer and business information and all other information of any kind and nature in Company databases and systems to which the Contractor is provided access. Contractor recognizes and acknowledges that all such information is of a confidential nature and is a valuable and unique asset of Company's business. Contractor agrees (i) to treat as secret and confidential all such information whether or not identified by Company as confidential.

2.  Contractor acknowledges that the relationships of the Company with its employees, customers and vendors are valuable business assets and the identity of, and relationships with, such parties are proprietary and constitute Confidential Information. Contractor agrees that, while the provisions of this Section 3(b) are in force Contractor will not directly or indirectly (for himself or for any third party) divert, circumvent, or attempt to divert or circumvent, from the Company any business, employee, customer, or vendor, through solicitation or otherwise.

## INDEPENDENT CONTRACTOR

1.  Contractor is acting as an independent contractor in performing the services hereunder. Nothing contained herein or done in pursuance of this Agreement shall constitute a joint venture, partnership, or agency for the other for any purpose or in any sense and neither party shall have the right to make any warranty or representation to such effect or to bind the other party.

## REPRESENTATIONS AND WARRANTIES

1.  Contractor represents and warrants on the Effective Date (as defined below) and during the Term that he is subject to no restrictions, contractual or otherwise (including, without limitation, non-competition, non-disclosure, and non-use restrictions) which are inconsistent with, or which could reasonably be expected to otherwise adversely affect the performance by the Contractor of the services as contemplated by this Agreement.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

## TERM AND TERMINATION

1. The term of this Agreement shall begin on January 9, 2024 (the "Effective Date"). This Agreement may be terminated by mutual agreement or by either party for any reason upon ten (10) days' notice to the other. The provisions of Section 3(a) and 3(b) shall survive any termination of this Agreement for a period of one (1) year. Upon termination, the Contractor shall return all Company property in his possession including, but not limited to, keys, access cards, electronic devices, and confidential information.

## DISPUTES; APPLICABLE LAW

1. It is agreed that any breach of the terms of this Agreement would cause significant harm to the Company and that monetary damages alone would be insufficient to compensate for the loss incurred by the Company. Therefore, in addition to any monetary damages, the Company shall be entitled to equitable relief by way of injunction (without the need of posting a bond or other equivalent security) as a remedy for any such breach or threatened breach. Such remedy shall not be deemed to be an exclusive remedy but shall be in addition to all other remedies available to the Company for all damages, costs and expenses incurred by it in this regard. This agreement shall be construed and governed in accordance with the laws of the State of New Hampshire without regard to its choice of law rules.

## OTHER PROVISIONS

1. Entire Agreement. This Agreement (including any schedules and exhibits attached hereto) constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement supersedes any and all prior and contemporaneous agreements, oral or written, between the parties with respect to the subject matter hereof.

2. Severability. If any provision of this Agreement is for any reason declared to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall be unaffected. Any such invalid or unenforceable provision shall be deemed modified to the extent necessary to render it valid and enforceable, and if no modification shall render it valid and enforceable, this Agreement shall be construed as if not containing such provision and the rights and obligations of the parties shall be construed and enforced accordingly.

3. Consents. Contractor consents to background check and use of his name and background information in any Company materials.

4. Amendment, Waiver, Modification or Termination. No amendment, waiver, or termination or modification of this Agreement shall be binding unless it is in writing and, in all cases other than termination, signed by both parties.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

5.    <u>Assignment.</u> Neither this Agreement nor any or all of the rights and obligations of the parties hereunder shall be assignable by either party without the prior written consent of the other party, except that Company may assign to any affiliate.

6.    <u>Successors and Assigns; Notice; Counterparts.</u> This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, and, to the extent permitted by subsection (e) above, successors and assigns of the parties hereto.  Any notice provided for in this Agreement must be in writing and must be either (i) personally delivered, (ii) mailed by registered or certified first-class mail, prepaid with return receipt requested, or (iii) sent by a recognized overnight courier service to the recipient at the address indicated in the first paragraph.  This Agreement may be executed in multiple counterparts by facsimile or otherwise and each counterpart shall be deemed an original and all such counterparts shall constitute the same agreement.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892
DocuSign Envelope ID: 9EAA847C-2A50-42CA-9A74-AA85B78748B0

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement on the date hereinbefore first written.

Employer Signatures :

*Shawn Connors*

Shawn Connors, CEO

Power Play Hockey, LLC

*John D. Kula, Jr.*

John D. Kula, Jr., CFO

Power Play Hockey, LLC

Contractor Signature :

DocuSigned by:

Nolan

E1E26D044A1B435...

Nolan Gauthier

Division Head

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892

# EXHIBIT C

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892



# Division Head – Job Description & SOP

**Power Play Hockey League (PPHL)**

---

**Position Title:**

Division Head

**Reports To:**

Regional Manager

**Position Type:**

Part-Time, Compensation Plan: Compensation is given in the sum of or up to one season player fee. This compensation will also be extended to tournament play for up to the cost of each tournament a PPHL employee attends.

For example: Season Fee: $485 (3 Seasons per year)

Tournament Fee: Battle of the Branches: $250; Puzzle Cup: $125; Other Tournaments may vary in costs.

Yearly Division Head Base Compensation: $1,455

2x Tournaments Attended Compensation: $375

**Total Compensation: $1,830**

*\* Players are compensated as a payment towards these fees. In some cases, additional or total compensation will be paid directly to PPHL Division Heads.*

---

**Mission Statement**

The mission of the Power play Hockey League (PPHL) is to attract adult hockey players of all levels and provide them with a great experience on and off the ice. Division Heads

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892



are vital to this mission by maintaining smooth operations of weekly games and ensuring a strong line of communication between players and the PPHL office.

Division Head Overview

The Division Head serves as the "boots on the ground" representative of the Power Play Hockey League (PPHL) and plays a critical role in the day-to-day execution of league operations within their assigned division. Ideally, the Division Head is an active player within their division and possesses a strong ability to familiarize themselves with the teams and participants.

This position is primarily responsible for the supervision and coordination of weekly games, team communications, ongoing player and team recruitment, retention efforts, registration management, incident documentation, and overall in-division operational execution. Division Heads act as the direct liaison between players, team captains, and PPHL Management, particularly in instances where a Regional Manager is unavailable.

Division Heads are expected to work closely with their Regional Manager to ensure alignment on all operational priorities and league standards.

Division Heads are expected to maintain an active and visible presence at their assigned rink(s), including attending games and activities that may fall outside of their own team's schedule.

This document is the property of the Power Play Hockey League (PPHL). Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be enforced by law. A separate document signed by each division head (restricted covenants agreement, non-solicitation, non-disclosure, and non-compete period of 24 months from the end of employment shall apply. Violations will result in legal action and financial penalties to recover damages per the signed contract.

## Key Responsibilities & Duties

1. **Registration**

- Ensure all captains register their teams and full rosters at least **three weeks prior** to the start of each season.
- Be physically present at rinks for the **first two weeks** of each new season for live registration support.

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892



- Confirm that all captains understand **players must be registered before Week 1**. Unregistered players are not allowed on the ice.
- If a player appears in Week 1 unregistered, they must register immediately. If not completed by Week 2, they may not play.
- **No players are allowed on the ice Week 2** if they were previously warned and failed to register.

**Access to Proprietary Information**

Division Heads will be provided access to our back end (SportsEngine, Crossbar, Avario, Horizon Web Ref, and any other software, google docs, or excel spreadsheets, and others not mentioned here), which includes but not limited to, Names, Emails, Phone Numbers, Addresses, and financial/payment information for every team within the division(s) that a division head oversees. This includes rink contacts, management, and all operational aspects of rink management for each rink in our league. Additionally, access to referees, assignors, and scorekeepers are considered proprietary information. Any other access given to contacts of the league would be included in this proprietary information. This proprietary access/data falls under the restricted covenants, non-disclosure, and non-compete signed by each division head at PPHL. This information could cause grave harm to the league if it is used improperly, but it is necessary to ensure a division head can establish communication, monitor team progress, and maintain accurate oversight of each team's participation and compliance throughout the season.

## 2. Financial Oversight

- **ALL Financial compliance, questions, concerns, and discrepancies should be sent to your Regional Manager as soon as possible.**

## 3. Compliance, Roster Accuracy & Disciplinary Oversight

- Issues regarding players or teams posing health/safety concerns, frequent ejections, or displaying negative behavior about the league must be escalated within 24 hours to your Regional Manager.
- **OFF-ICE INCIDENTS**: The **PPHL Regional Manager and Owners, collectively, will handle formal removals**; on-ice incidents should be communicated to the regional Managers ONLY, and otherwise are not Division Head's responsibility. The Division Head's responsibility is to document and report incidents accurately and promptly. Incident reports *may* be necessary, given the incident, and are evaluated or expected on a case-by-case basis.
- Division Heads are strongly encouraged to regularly check in with their Regional Managers to ensure roster accuracy and to stay informed about any players who are ineligible to participate. This includes players who are suspended, have

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892



outstanding payments, are not rostered appropriately based on parity considerations, or for any other reason deemed inappropriate for ice participation.

- Before asking any player to leave the ice, Division Heads must consult their Regional Manager for approval and support. If a Division Head does not feel comfortable addressing the player directly, they should immediately report the incident to their Regional Manager with specific details, including the date, time, and nature of the issue.

## 4. Weekly Operations

- Maintain communication with your Regional Manager on a weekly basis
- Maintain communication with your teams, captains, and players on a weekly basis
- Attend and participate in **division head and management meetings**. These meetings run at a minimum 1x per season.  Your feedback is expected and valued.
- Stay up to date with SOP. You will be notified when updates occur.

## 5. Customer Service & Retention

- Perform **check-ins with all teams four weeks before the next season** and report findings to the office.
- Assist in resolving any concerns teams may have to increase retention.
- Work collaboratively with the Regional Manager to strategize on keeping retention rates high and improving customer satisfaction.

## 6. Communication & Customer Service

- Be proactive in responding to team questions about schedules, player eligibility, payments, etc.
- Communicate any operational issues to the office as they arise.
- Attend weekly games and provide in-person support to teams and referees.

## 7. Legal Safeguards

This document is the property of the Power Play Hockey League (PPHL). By signing the restricted covenants, non-compete, and non-disclosure agreements, or accepting this role, the Division Head agrees to the terms and responsibilities outlined in those agreements. Any use of proprietary league information, including but not limited to: team contacts, league data, business methods, schedules, player info, and communications, for the purpose of establishing or assisting a competing league is strictly prohibited and will be

Date Filed 7/3/2025 12:53 PM
Superior Court - Worcester
Docket Number 2585CV00892



enforced by law. Violations will result in legal action and financial penalties to recover damages.

See Power Play Hockey League (PPHL) New Hire Restrictive Covenant agreement, non-compete, and non-disclosure agreements provided in a separate document. You must sign a copy upon hire and/or revision.

Your signed copy will be held in PPHL records.

This position strictly prohibits:

- Soliciting PPHL players, captains, teams, referees, back end companies (SportsEngine or Crossbar, and other systems PPHL uses to manage the league), or rink partners, vendors, and other companies associated with PPHL.
- Creating or supporting a competing adult recreational hockey league within any region PPHL operates for a period of 2 full years (or 24 months) after departure.
- Using or disclosing proprietary league systems, documents, or internal communications.